# IN THE MATTER OF THE APPLICATION FOR WRIT OF HABEAS CORPUS BY D. D.

### Superior Court of New Jersey
### Appellate Division

Argued November 9, 1971—Decided December 23, 1971.

2

Before Judges KILKENNY, LABRECQUE and LANE.

*Mr. Michael S. Bokar,* Legal Aid Society of Mercer County, argued the cause for appellant.

*Mr. Joseph T. Maloney,* Deputy Attorney General, argued the cause for respondent, Department of Institutions and Agencies (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Messrs. Alfred L. Nardelli and Joseph T. Maloney,* Deputy Attorneys General, on the brief).

*Mr. Arthur Meisel* filed a brief *amicus curiae* for the American Civil Liberties Union of New Jersey.

The opinion of the court was delivered by
KILKENNY, P. J. A. D. D. D. (hereinafter "Debbie"), a 17-year-old girl born on July 31, 1954, is now and since her last transfer thereto on April 21, 1971 has been confined as a mental patient in the female wing of the Vroom Building, a maximum security unit of the State Hospital for mental patients, now known as Trenton Psychiatric Hospital.

Debbie wrote a letter to Judge Kingfield stating therein:
Dear Sir:

I am a 16 year old girl and I am being held in the Vroom Building. I do not want to stay here.

Please give me a lawyer and a hearing to get out of here.

(D.D.)

The letter was witnessed by an assistant social work supervisor and an assistant supervisor of security.

Judge Kingfield treated the letter as a petition for a writ of *habeas corpus* and referred the matter to the Legal Aid

4

Society of Mercer County, which designated an attorney to represent Debbie. Judge Kingfield personally conducted a hearing at the Vroom Building. Debbie, as well as her attorney, attended the hearing. There was medical and other testimony on behalf of Debbie and on behalf of the State.

Having considered the testimony of Dr. Edward Folmer and Dr. Hubert M. Hoffman of the Medical Staff of the Trenton Psychiatric Hospital, the only medical witnesses, from which it appeared that Debbie is incompetent and, if released, would be dangerous to herself or to others or to the property of others; and having been satisfied that Debbie is in need of further hospitalization for her mental condition, Judge Kingfield entered an order on June 21, 1971 denying Debbie's petition for her release and directing that she be "confined at the Trenton Psychiatric Hospital until restored to reason and discharged therefrom according to law."

The present appeal is by Debbie from the judgment of June 21, 1971. The following contentions are made:

I. The statute under which Debbie was committed to Trenton Psychiatric Hospital at the request of the Bureau of Children's Services is invalid under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

II. Persons committed to a State Mental Hospital in New Jersey are constitutionally and statutorily entitled to receive adequate and effective treatment designed to cure or improve their condition.

III. The transfer of Debbie from East Hospital to the Vroom Building and her continued confinement there without a hearing and without a reasoned consideration of less drastic alternatives are unconstitutional as a deprivation of liberty without due process.

 The evidence unquestionably supports Judge Kingfield's findings and conclusions that Debbie is incompetent, would be dangerous to herself and others if released, and is in need of further hospitalization for her mental condi-

tion. Dr. Hoffman, testifying for defendant as a licensed doctor and holding the administrative position of chief of service of the East Hospital, a less confining unit than the maximum security Vroom Building, was familiar with Debbie and had observed her treatment in the East Hospital. Her treatment consisted essentially of chemotherapy. Debbie was transferred by an administrative officer's order from the East Hospital to the Vroom Building on April 21, 1971 because on that date there was an altercation between Debbie and an attendant. The employees refused to go on their jobs if she was not transferred. Dr. Hoffman stated that Debbie was occasionally "assaultive" and a "fairly-strong" girl requiring "a couple of people to hold her" when she gave them trouble. The doctor felt that the Vroom Building was not a proper place for Debbie, but she should not be returned to the so-called "civil section" because "the employees would walk out immediately."

Dr. Folmer testified that he was Debbie's treating physician and has known her for many years in both the East Hospital and the Vroom Building, to which her last admission was on April 21, 1971 when she struck a woman, caused the woman to be sent to a hospital, and this woman "is now partially disabled." He stated that Debbie has schizophrenia, suffers from hallucinations, and does not have a passive-aggressive personality. She has been in a mental hospital since the age of eight, being first diagnosed in 1962 as a childhood schizophrenia. There is definite evidence that she is now psychotic and has a borderline I. Q. of 79. The doctor averred that she should remain hospitalized. He recommended 200 milligrams of Thorazine three times a day, to start with.

We conclude at this point that the Vroom Building is not a proper place in which to confine Debbie. The only medical witnesses so agreed. We might add that she is the only juvenile there. The other female patients are all adults and the majority have been committed to that unit because they are criminally insane. The only possible reason for

keeping Debbie there is because of its maximum security feature. But this reason is greatly outweighed by the building's detrimental factors. We direct the transfer of Debbie from the Vroom Building within 30 days, if that transfer has not already been effected. We leave to the administrative officials the selection of another suitable hospital, subject to judicial review if necessary.

It is beyond question that a person committed to a state hospital for the mentally afflicted has a right to receive treatment in an effort to cure or improve his or her condition. It is a notorious fact that overcrowding and understaffing in our public mental institutions result in inadequate treatment for the average patient. But recognition must be given to a patient's right to treatment. It is not enough to confine the patient, to afford only minimal custodial care, to institutionalize him or her in a mental prison. It has been stated that civil confinement for an indefinite duration may be sufficiently inhumane so as to constitute cruel and unusual punishment, violative of due process of law. 15 *Villanova Law Review* 961 (1970).

We recognize that the Legislature is better equipped to create specific procedures and establish the necessary institutions to insure a mental patient's right to treatment than are the courts. However, in the absence of any legislative implementation, the court must function to protect the rights of persons committed to our public mental institutions. The court may insure that the administrators have performed their task with care and reached a reasonable result.

The "continuing failure to provide suitable and adequate treatment cannot be justified by lack of staff or facilities." *Rouse v. Cameron,* 125 U. S. App. D. C. 366, 373 *F.* 2d 451, 457 (D. C. Cir. 1967). See, too, "The Right to Treatment," 77 *Yale L. J.* 87, 111 (1967).

In 1960 the *American Bar Association Journal* heralded the advent of a new right, the right of the involuntarily committed mental patient to receive adequate treatment:

The fact that a person has a mental ailment is not a crime. Therefore, if anyone is voluntarily restrained of his liberty because of a mental ailment the state owes a duty to provide for him reasonable medical attention. If medical attention reasonably well adapted to his needs is not given, the victim is not a patient but is virtually a prisoner. ["A New Right," 46 *A. B. A. J.* 516, 517 (1960)]

Incarceration with mere custodial care need no longer be sanctioned in a society apprised of the many advances in psychiatric techniques.

Our own statutes make the foregoing abundantly clear. *N. J. S. A.* 30:4–7.1 provides in part:

It is hereby declared to be the public policy of this State to make maximum provision for the health, safety and welfare of incompetent patients in State and county institutions for the mentally ill and mentally retarded * * *.

*N. J. S. A.* 30:4–24.1 provides:

Every individual who is mentally ill or mentally retarded shall be entitled to humane care and treatment and, to the extent that facilities, equipment and personnel are available, to medical care and other professional services in accordance with the highest accepted standards. * * *

*Habeas corpus* challenges the place as well as the fact of confinement, even if the challenged place is a particular ward or section of the hospital complex, and specifically if the particular ward or section is a maximum security unit, as here. *Covington v. Harris,* 136 U. S. App. D. C. 35, 419 *F.* 2d 617, 620 (D. C. Cir. 1969).

We find no need to decide whether the statute under which plaintiff was committed is invalid. The issue was not raised in the trial court.

We conclude that Debbie should be transferred from the Vroom Building as soon as conveniently possible, and in all events within 30 days. She is to be transferred to a more appropriate place for suitable treatment, subject to judicial review if the appropriateness of relocation or treatment is

questioned before the Law Division. We do not retain juris-diction.

Except as herein otherwise provided the judgment is af-firmed.