Patricia WELSCH, by her father and natural guardian, Richard W. Welsch, et al., Plaintiffs,

v.

Vera J. LIKINS, Individually and as Commissioner of Public Welfare for the State of Minnesota, et al., Defendants.

No. 4–72–Civ. 451.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 15, 1974.

---

Luther A. Granquist and Neil H. Mickenberg, The Legal Aid Society of Minneapolis, Inc., Minneapolis, Minn., for plaintiffs.

Warren Spannaus, Atty. Gen., State of Minnesota, by Theodore N. May, Special Asst. Atty. Gen., Judy L. Oakes, Asst. Atty. Gen., and Thomas L. Fabel, Dep. Atty. Gen., St. Paul, Minn., for defendants.

LARSON, District Judge.

### MEMORANDUM

Six mentally retarded residents of the Minnesota State Hospitals bring this action seeking declaratory and injunctive relief regarding treatment and conditions in six State-owned hospitals and alternatives to placement in these institutions.

Ranging in ages from 18 to 33 years-old and in degree of retardation from moderate to severe, the plaintiffs have been involuntarily (judicially) committed to the care and custody of the defendant Commissioner of Public Welfare.[1] They seek to represent a class composed of themselves and all other mentally retarded persons currently and hereafter involuntarily committed to the Minnesota State Hospitals at Brainerd, Cambridge (including the Lake Owasso Annex), Faribault, Fergus Falls, Hastings, and Moose Lake.[2]

1. The named plaintiffs consist of five women and one man. Two of them reside at the Cambridge State Hospital, two at the Faribault State Hospital, and one each at the State Hospitals at Fergus Falls and Hastings. The dates of their commitments range from 1956 to 1971. One of the plaintiffs was released from the guardianship of the Commissioner of the Department of Public Welfare in 1971 but continues to reside at the Faribault institution.

There generally are considered to be four degrees of retardation, ranging from mild to profound. Derived from IQ scores, the classification system is based upon the extent of an individual's mental impairment. Those with IQ's of between 50 and 70 are considered mildly retarded, 35 to 50 are moderately retarded, 35 to 20 are severely retarded, and those with IQ's below 20 are considered profoundly retarded. Persons with mental deficiencies often suffer from equally abnormal physical impairments. In particular, severely and profoundly retarded individuals frequently have serious physical defects.

2. The class plaintiffs seek to represent numbers more than 3,500 persons, the overwhelming majority of whom have been judicially committed and institutionalized as mentally deficient persons pursuant to the Minnesota Hospitalization and Commitment Act, M.S.A. §§ 253A.01–253A.21, a civil commitment statute. The procedures by which they have been committed are not here at issue.

The Department of Public Welfare has responsibility for fourteen institutions, ten of which are State hospitals, serving about 16,000 mentally retarded, mentally ill, and chemically dependent persons. Besides the six institutions being challenged in this action, the other hospital facilities for the retarded are at Anoka, Rochester, and two at St. Peter. Until a decade ago, only three of these ten institutions served mentally retarded persons. But changes in Department of Public Welfare policies over the last several years have resulted in virtually all of the mentally retarded persons being concentrated at the six challenged institutions. According to the Department, the average daily population of the ten facilities in early 1973 was 6,718 persons. More than half, 3,992 persons, were mentally retarded. Pl. Ex. 47, p. 2.

Cambridge and Faribault are the only two facilities that exclusively serve mentally retarded residents. Faribault, with about 1,400 residents, has the largest concentration of judicially committed mentally retarded persons of any State institution in Minnesota.

Although maintainability as a class action has not yet been litigated or determined by the Court under Rule 23(c)(1) of the Federal Rules of Civil Procedure, the parties have by stipulation confined the case thus far to the purported subclass of residents at the Cambridge State Hospital. Determination of certain legal and factual issues at that institution will facilitate consideration of the issues at the five other challenged institutions.

The defendants are public officials responsible for the care and conditions of the plaintiffs and the class they seek to represent. Defendant Vera J. Likins is the Commissioner of Public Welfare for the State of Minnesota; defendant Ove Wangensteen is the former Acting Commissioner of Public Welfare and cur-rently is the Assistant Commissioner of Public Welfare; the other six defendants are the administrators of the six State Hospitals.[3]

The plaintiffs contend that defendants have been and currently are violating the due process clause of the Fourteenth Amendment of the Constitution by not providing an adequate program of "habilitation," consisting essentially of individualized treatment, education, and training for the residents of the institutions. Plaintiffs term this as the "Right to Treatment." They make a similar State law claim under the Minnesota Hospitalization and Commitment Act, as amended. M.S.A. §§ 253A.01–253A.21.

They also assert a due process claim compelling defendants to seek out and

---

The facility at Cambridge is located about 45 miles north of the Minneapolis-St. Paul area in Isanti County, southwest of the City of Cambridge. It has a current population of about 750 residents, about a third as many as resided there in 1961 and 200 fewer than were housed there in 1970–1971. The vast majority of persons discharged over the past several years have been mildly or moderately retarded.

Of its current population, about half are under 21 years of age and 90 per cent are either severely or profoundly retarded. About 31 per cent are severely physically handicapped, 24 per cent are non-ambulatory, and 23 per cent are incontinent. Many of the mildly retarded residents suffer from emotional or behavioral problems, as well.

The residents are housed in 13 buildings, six of which date from the 1920's and 1930's, when the institution was known as the Colony for Epileptics. Five of the residential buildings were constructed in the 1950's, after the State legislature changed the name of the institution to the Cambridge State School and Hospital. Two modern residences, the Dellwoods (North and South), were constructed in 1971, four years after the legislature changed the identity to its present name of the Cambridge State Hospital. Under a reorganization program implemented shortly before the trial commenced, Cambridge residents are grouped into six different units, based generally on degree of retardation and age.

Cambridge serves the central third of the State, housing residents from as many as eighteen counties. Most of its residents now come from a nine county vicinity comprising the Twin Cities metropolitan area.

The Lake Owasso Children's Home is a satellite institution of Cambridge, funded under Cambridge's budget but operated independently. Seventy-seven mentally retarded children reside there. This facility is comprised of ten acres and seven buildings leased from Ramsey County and operated as an annex to Cambridge since 1961. The lease will terminate this summer. The Department of Public Welfare has recommended non-renewal and the closure of the facility. Pl.Ex. 51, p. 11.

According to a report prepared by the Department for the legislature in March 1973, Cambridge is considered to be the third most efficient of the Minnesota State Hospitals. Pl.Ex. 52, Tabs. 33(I), 33(J), 34.

3. Since 1971, the State Hospitals have operated under a "troika" system of leadership, consisting of an administrator responsible for physical plant, personnel, and budget; a medical director, responsible for health services; and a program director, responsible for coordinating training and education programs. Ultimate responsibility for each institution is vested in the Commissioner of Public Welfare.

At the time of trial, Cambridge's administrator was defendant John H. Stocking. Since the trial, he has been appointed administrator of the Anoka State Hospital. Cambridge has not had a medical director since April 1972. At the time of trial, one of its three physicians was serving as designated "chief of health services." The institution employed a temporary program director as of the time of the trial.

develop less restrictive, community based alternatives for the care and treatment of judicially committed mentally retarded persons. They further contend that certain restrictions and conditions existing at the institutions violate the cruel and unusual punishment clause of the Eighth Amendment.

Extensive relief is sought. Plaintiffs desire declaratory judgments regarding their rights to treatment and less restrictive alternatives and also injunctive relief specifying minimal constitutional standards of treatment and further compelling defendants to adhere to such standards and to plan and provide the plaintiffs and the class with less restrictive alternatives to institutionalization.

■ This Court's jurisdiction is based on 28 U.S.C. § 1343(3), relating to actions arising under the Civil Rights statute, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201, 2202, relating to declaratory judgments. The Court has pendent jurisdiction over the State law claim. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

A twelve day trial was conducted in September and October 1973. Various professional experts in mental retardation were among the witnesses testifying for both sides. Much documentary evidence also was received. Following completion of the presentation of evidence, the Court on October 17 made an unannounced one-day tour of the facilities at Cambridge, accompanied by counsel for both sides.

Because there are preliminary legal issues dispositive of many of the claims in this case, the Court now deems it appropriate to pass upon these questions. In so doing, the Court cannot divorce itself entirely from the factual evidence presented in this case. In the main, however, this decision will be confined to certain threshold legal issues. At a subsequent date, the Court will consult with the parties before entering formal Findings of Fact and Conclusions of Law, required under Rule 52(a), and making its determination regarding the nature of relief, if any, that may be granted.

## I. Constitutional Right to Treatment.

■ Because civil confinement in a State institution involves a "massive curtailment of liberty," Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), it bears scrutiny under the due process clause of the Fourteenth Amendment. This infringement on liberty is particularly true in Minnesota, where the plaintiffs and the class they purport to represent face severe restrictions on their personal freedoms as a result of being committed to the care and custody of the Commissioner of Public Welfare. See Department of Public Welfare Manual VII— 7325.03 (empowering the Commissioner to control the residence, freedom to marry and divorce, making of contracts, and management of property of committed persons). See also MSA § 256.- 07 (forced sterilization, under certain circumstances); M.S.A. § 171.04(5) (1973 Supp.) (inability to obtain driver's license).

Whether such commitment gives rise to a constitutional right to treatment is a difficult question, involving complex legal, medical, and "political" considerations. See Martarella v. Kelley, 349 F.Supp. 575, 598 (S.D.N.Y.1972), enforcement, 359 F.Supp. 478, 483–486 (S.D.N.Y.1973); New York State Association for Retarded Children, Inc. v. Rockefeller, 357 F.Supp. 752, 758 (E.D. N.Y.1973).

Analysis of plaintiffs' claim must begin with Rouse v. Cameron, 125 U.S. App.D.C. 366, 373 F.2d 451 (1966). Involuntarily committed to a mental hospital following his acquittal by reason of insanity on a misdemeanor charge, Rouse brought a petition for a writ of habeas corpus in the District Court. He based his petition on a right to be discharged in the absence of receiving adequate treatment. The District Court denied the writ, viewing its jurisdiction

as limited to the question whether the petitioner had regained his sanity.

Drawing on prior decisions in the District of Columbia Circuit and elsewhere, Judge Bazelon, writing for the majority, reversed and remanded the case for a hearing and findings on the adequacy of treatment accorded the petitioner.[4] In so doing, the Court declared the existence of a right to treatment under the 1964 Hospitalization of the Mentally Ill Act, D.C.Code § 21–562 (Supp. V, 1966).

Although this right was predicated on statutory grounds, the Court observed that civil commitment without treatment would raise "considerable constitutional problems" under the due process, equal protection, and cruel and unusual punishment clauses. 373 F.2d at 453. The District of Columbia Circuit Court has subsequently reiterated these views, again relying on statutory grounds. In re Curry, 147 U.S.App.D.C. 28, 452 F.2d 1360, 1362–1363 (1971); Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617, 623–625 (1967).

Rouse is considered the seminal decision from which all other right to treatment cases are traceable. See New York State Association for Retarded Children, Inc. v. Rockefeller, supra, 758. But the principles proclaimed in Rouse had aroused critical thought and approval several years earlier. See Editorial, A New Right, 46 A.B.A.J. 516 (1960); Birnbaum, The Right to Treatment, 46 A.B.A.J. 499 (1960). Many subsequent cases have relied on Rouse in expressly finding a constitutional right to treatment for persons confined or incarcerated under State authority without having been found guilty of criminal offenses. E. g., Martarella v. Kelley, supra, 349 F.Supp. at 599–601; Wyatt v. Stickney, 325 F.Supp. 781, 784 (M.D.Ala.1971); Nason v. Superintendent, Bridgewater State Hospital, 353 Mass. 604, 613, 233 N.E.2d 908, 913 (1968).

Wyatt is the most notable of these cases and the one upon which plaintiffs place primary reliance in the instant case. In a series of decisions involving two State hospitals for the mentally ill and one for the mentally retarded in Alabama, Judge Johnson found that the institutions failed to meet minimally adequate standards of treatment and hence violated the residents' rights under the due process clause.[5]

4. On remand, the District Court found that Rouse was receiving adequate treatment. This determination was reversed for errors in the original commitment, without reaching the treatment issues. Rouse v. Cameron, 128 U.S.App.D.C. 283, 387 F.2d 241 (1967).

5. The complaint in Wyatt initially was filed on behalf of employees and residents of Bryce Hospital for the mentally ill. Amended complaints dropped the employees' claims and added to the plaintiffs' class residents of Searcey Hospital for the mentally ill and Partlow State School and Hospital for the mentally retarded. The defendants were the Alabama Department of Mental Health, the Alabama Mental Health Board and its members, the Governor of Alabama, and the probate judge of Montgomery County as representative of all of Alabama's probate judges, who preside over civil commitment cases.

In its first formal opinion and decree the Court stated that residents of Bryce were being deprived of their constitutional right to treatment. 325 F.Supp. 781, 784 (M.D. Ala.1971). After defendants failed to satisfy the Court's directive to promulgate and effectuate minimum standards for adequate treatment of the mentally ill, the Court issued an interim order determining that such standards must be judicially formulated and ordered implemented. 334 F.Supp. 1341 (M.D.Ala.1971).

The Court then conducted hearings at which many noted experts and representatives of medical organizations testified. (Many of the same persons and groups have participated in the instant case.) Extensive relief was ordered for the Bryce and Searcey institutions. 344 F.Supp. 373, 379–386 (M.D.Ala. 1972).

Dealing specifically with the situation at Partlow, the Court declared that "no viable distinction" exists between civilly committed mentally ill and mentally retarded persons for right to treatment purposes. Therefore, residents at Partlow were entitled to comparable treatment as those at Bryce and Searcey. Similar extensive relief thus was ordered. 344 F.Supp. 387, 395–407 (M.D. Ala.1972).

Wyatt has been appealed to the Fifth Circuit. Appeal docketed sub nom. Wyatt v. Aderholt, No. 72–2634 (5th Cir. Aug. 1, 1972).

Based on *Rouse* and other District of Columbia Circuit cases, Judge Johnson stated that persons involuntarily committed for mental deficiencies "unquestionably have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition." 325 F.Supp. 781, 784. This right springs from the principle that treatment, not mere custodial care or punishment, "is the only justification, from a constitutional standpoint, that allows civil commitments to mental institutions . . . ." *Ibid.*

The three essential conditions to fulfill this right to treatment were declared to be a humane psychological and physical environment, qualified staff personnel in sufficient numbers, and individualized treatment plans. 334 F. Supp. 1341, 1343. To implement this right, extensive relief was ordered, encompassing medical and constitutional minimums. 344 F.Supp. 373, 379–386; 344 F.Supp. 387, 395–407.

Just as *Rouse* has been a foundation of the due process right proclaimed by Judge Johnson, *Wyatt*, in turn, has been relied on by numerous other Courts in finding a constitutional right to treatment in other settings of State imposed confinement of noncriminal offenders.

In Stachulak v. Coughlin, 364 F.Supp. 686 (N.D.Ill.1973), a petition for a writ of habeas corpus was brought by a person confined under Illinois' Sexually Dangerous Persons Act. Ruling on a preliminary motion, Judge Marovitz expressly noted his agreement with *Wyatt's* holding of a "constitutional right to treatment for civilly committed mental patients." 364 F.Supp. at 687.

A three judge court in Davy v. Sullivan, 354 F.Supp. 1320, 1330 (M.D.Ala. 1973) held that treatment under Alabama's sexual psychopath statute must conform to the constitutional minimum requirements set forth in *Wyatt*.

In Morales v. Turman, 364 F.Supp. 166, 175 (E.D.Tex.1973), *Wyatt* again was relied upon for holding in favor of a due process right to treatment for juveniles committed to a correctional institution. Similarly, Inmates of Boys' Training School v. Affleck, 346 F.Supp. 1354, 1372 (D. R.I.1972), cited *Wyatt* as indicative of the probability of a successful showing that juvenile offenders have a constitutional claim to receive rehabilitative treatment. *See also* Martarella v. Kelley, *supra*, 349 F.Supp. at 600.

Cases upholding a right to treatment for noncriminals incarcerated under State authority have not been confined to Federal forums. In Nason v. Superintendent, Bridgewater State Hospital, *supra*, a petition for a writ of habeas corpus was brought by a person who had been indicted for murder and then transferred to an institution for the mentally ill without standing trial. In his prior unsuccessful attempt to mandamus improved treatment, the State had implicitly recognized a right to treatment, apparently statutorily based, for those committed in lieu of criminal sanctions. Nason v. Commissioner of Mental Health, 351 Mass. 94, 98, n. 4, 217 N.E.2d 733, 736, n. 4 (1966).

In the following habeas proceeding, it was held that the petitioner could seek judicial release from custody if the authorities failed to provide him with suitable treatment. The Court based its decision on "[c]onfinement of mentally ill persons, not found guilty of crime, without affording them reasonable treatment . . . [raising] serious questions of deprivation of liberty without due process of law." 353 Mass. 604, 612, 233 N.E.2d 908, 913. *See also* Application of D. D., 118 N.J.Super. 1, 6, 285 A.2d 283, 286 (1971) ("It is beyond question that a person committed to a state hospital for the mentally affected has a right to receive treatment in an effort to cure or improve his or her condition."); Silvers v. People, 22 Mich.App. 1, 4, 176 N.W.2d 702, 703 (1970) (declaring inviolate the "right to treatment where detention is based upon commitment for a mental disorder and not upon a finding of guilt on the substantive crime . . . .").

These cases that have expressly or inferentially supported a constitutional right of treatment for persons confined under State authority without having been guilty of criminal offenses have been subject to considerable critical analysis. *See, e. g.,* Comment, Wyatt v. Stickney and the Right of the Civilly Committed Mental Patients to Adequate Treatment, 86 Harv.L.Rev. 1282 (1973); Murdock, Civil Rights of the Mentally Retarded: Some Critical Issues, 48 Notre Dame Lawyer 133 (1971); Symposium, The Right to Treatment, 57 Geo.L.J. 673 (1969); Note, The Nascent Right to Treatment, 53 Va.L.Rev. 1134 (1967); Note, Civil Restraint, Mental Illness and the Right to Treatment, 77 Yale L.J. 87 (1967). Not all of it has been entirely favorable to the views expressed in those cases. *E. g.,* Note, The Nascent Right to Treatment, *supra,* 1137–1143; Note, Civil Restraint, Mental Illness and the Right to Treatment, *supra,* 103, n. 62.

Nor have the cases uniformly subscribed to the holdings in *Wyatt.* Various forms of relief were sought on behalf of the mentally retarded residents at New York's Willowbrook State School in New York State Association for Retarded Children, Inc. v. Rockefeller, *supra.* After analyzing many of the right to treatment cases, including *Wyatt,* Judge Judd initially declared that although due process "may be an element in the right to protection from harm, . . . it does not establish a right to treatment." 357 F.Supp. 752, 762. Two of the principal reasons for the Court's disagreement with *Wyatt* are inapplicable to the instant case.

First, the Court noted that many of the mentally retarded residents at Willowbrook were there because their needs for supervision left them with "no alternative." *Ibid.,* 759–760. But under Minnesota law a number of alternative dispositions are potentially available for the placement of mentally retarded persons committed to the care and custody of the Commissioner of Public Welfare. M.S.A. § 253A.07 subd. 18. The instant action only involves conditions and practices within six State hospitals for the mentally retarded, Cambridge in particular in this portion of the case. Therefore, alternatives do exist here; hospitalization is not necessarily the only recourse for the plaintiffs and the class they purport to represent.

The second argument in *New York State Association for Retarded Children*—that residents at Willowbrook were not being denied a right to release—also is inapplicable here. 357 F.Supp. at 759. Minnesota law is much more circumspect than New York law regarding the release of persons who have been civilly committed for mental reasons. *See* 1973 amendments to New York's Mental Hygiene Law, § 33.25 (McKinney's Consol. Laws c. 27, Supp.). In Minnesota, release of a committed person is solely within the control of the Commissioner of Public Welfare, who may do so only upon "such conditions guaranteeing the necessary care and treatment of such patient as the commissioner may prescribe." M.S.A. § 253A.13 subd. 1. Furthermore, a released person remains "subject to supervision and return to custody" until unconditionally discharged. M.S.A. § 253A.13 subd. 2. An unconditional discharge may be obtained only following a Probate Court hearing and adjudication. M.S.A. § 253A.19 subd. 1.

In any event, Judge Judd's decision does not foreclose the possibility of recognizing a right to treatment in that case. A subsequent Order in *New York State Association for Retarded Children* reserves ruling on this issue, pending further evidence and legal argumentation. 72 Civ. 356, 357, at 2 (May 23, 1973).

In Burnham v. Department of Public Health of State of Georgia, 349 F.Supp. 1335 (N.D.Ga.1972), the Court explicitly disagreed with *Wyatt* in a case involving mentally ill and retarded residents of the Georgia state institutions. *Burnham* first pointed out that *Rouse* and other cases relied upon in *Wyatt* were based on statutory interpretation. 349 F.Supp. at 1339–1340. It then distinguished the factual situation existing at the Alabama institutions insofar as conditions that

there were much worse than those existing at the facilities being challenged in Georgia. *Ibid.*, 1340–1341. The amorphousness of the concept of "treatment" from a medical standpoint was cited as a reason for considering the case to be nonjusticiable. *Ibid.*, 1341–1342. Finally, *Burnham* felt the matter was "beyond the technical expertise" of the judiciary and hence should be resolved by legislative and executive branches of State government. *Ibid.*, 1344.

The Court does not think that these arguments undercut the persuasive authority of *Wyatt*. As to the statutory basis for *Rouse* and other District of Columbia cases, the language and reasoning of those decisions clearly reflect the view that the construction of the statute calling for a right to treatment was an alternative to invalidating the statute on constitutional grounds. See, *e. g.*, Rouse v. Cameron, *supra*, 373 F.2d at 453. Other cases have used virtually identical language as *Rouse* in severely doubting the permissibility of State confinement of persons not adjudged as criminals without providing them with adequate treatment. Humphrey v. Cady, *supra*, 405 U.S. at 514, 92 S.Ct. 1048 ("substantial constitutional claim"); United States v. Pardue, 354 F.Supp. 1377, 1382 (D.Conn.1973) ("serious questions of due process and cruel and unusual punishment"); United States v. Walker, 335 F.Supp. 705, 708 (N.D.Cal.1971) ("would certainly face constitutional problems"); United States v. Jackson, 306 F.Supp. 4, 6 (N.D.Cal.1969) ("seemingly incurable constitutional infirmities").

The factual differences between conditions at the institutions challenged in the *Wyatt* litigation and those at issue in *Burnham* as well as in the instant case may properly be reflected in the findings of fact and nature of relief, if any. They do not in themselves resolve the threshold legal questions.

With regard to nonjusticiability, it may be true, as defendants contend, that successful "habilitation" is an elusive and a relative concept. *See generally* Szasz, The Right to Health, 57 Geo.L.J. 734,

743–751 (1969). While a court is not equipped to become engaged in day-to-day or long range administration of a facility such as Cambridge, there are standard judicial measures whereby it can pass upon issues and problems relative to a right to treatment. *See* Rouse v. Cameron, *supra*, 373 F.2d at 456–458.

The evidence in the instant case is overwhelming and convincing that a program of "habilitation" can work to improve the lives of Cambridge's residents. Testimony of experts and documentary evidence indicate that everyone, no matter the degree or severity of retardation, is capable of growth and development if given adequate and suitable treatment. *See* Pennsylvania Association for Retarded Children v. Commonwealth of Pennsylvania, 334 F.Supp. 1257, 1259 (E.D. Pa.1971) (three judge court); *see generally Residential Programming for Mentally Retarded Persons* (collection of pamphlets published by the National Association for Retarded Children) (1972). Cambridge's own Policy and Procedural Manual reflects this belief. At 1–2 (August 1972).

As skilled and dedicated professionals, Cambridge officials are cognizant of this and are planning to improve upon their present efforts in a more sophisticated fashion under the institution's newly implemented reorganization plan. *See* n. 2, *supra*. This, of course, will be taken into consideration in framing the relief in this case.

Both *Wyatt* and *Burnham* have been appealed to the Fifth Circuit. Wyatt v. Aderholt, No. 72–2634 (Aug. 1, 1972); Burnham v. Department of Public Health of State of Georgia, No. 72–3110 (Oct. 5, 1972). The cases have been consolidated and were argued and submitted on December 6, 1972. The Fifth Circuit has not yet decided the issues presented in those cases.

Regardless of their ultimate dispositions by the Fifth Circuit, the Court believes that *Wyatt*, rather than *Burnham*, should be followed here. *Wyatt* does not clearly elaborate upon the analysis employed in proclaiming the constitutional

right to treatment. *See* New York State Association for Retarded Children, Inc. v. Rockefeller, *supra*, 761; Comment, Wyatt v. Stickney and the Right of Civilly Committed Mental Patients to Adequate Treatment, *supra*, 1287. But its underlying premises are well established and convincing. There essentially are two rationales supporting the right to treatment.

One theory is that commitment pursuant to civil statutes generally lacks the procedural safeguards afforded those charged with criminal offenses. The constitutional justification for this abridgement of procedural rights is that the purpose of commitment is treatment. Rouse v. Cameron, *supra*, 373 F.2d at 453; Inmates of Boys' Training School v. Affleck, *supra*, 1368; Wyatt v. Stickney, *supra*, 325 F.Supp. at 784. *Cf.* McKeiver v. Pennsylvania, 403 U.S. 528, 552, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (White, J., concurring); Knecht v. Gillman, 488 F.2d 1136, 1138 (8th Cir. 1973). Although plaintiffs have suggested that procedural safeguards are wanting under the Minnesota Hospitalization and Commitment Act, Plaintiffs' Post-Trial Memorandum, at 4, n. 3, the question has not been put at issue here. Without having been litigated, this *quid pro quo* rationale, *see* New York Association for Retarded Children, Inc. v. Rockefeller, *supra*, 761; is inapplicable to the instant case.

But the second major rationale does strike a responsive chord in this case. Simply put, it is that because plaintiffs have not been guilty of any criminal offenses against society, treatment is the only constitutionally permissible purpose of their confinement, regardless of procedural protections under the governing civil commitment statute. Wyatt v. Stickney, *supra*, 325 F.Supp. at 784.

This argument rests upon the Eighth and Fourteenth Amendments, relying principally upon the Supreme Court's decision in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). *Robinson* held that the cruel and unusual punishment clause prohibits conviction for a criminal offense and con-comitant criminal incarceration solely for the "status" of being a narcotics addict. 370 U.S. at 665–667, 82 S.Ct. 1417. *Cf.* United States ex rel. Schuster v. Herold, 410 F.2d 1071, 1088 (2d Cir. 1969), cert. denied, 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed. 2d 96 (1969); *but cf.* Smith v. Follette, 445 F.2d 955, 961 (2d Cir. 1971) (prisoner has no constitutional right to treatment for narcotics addiction).

Contending that *Robinson* hinged upon "status" as constituting a criminal offense, defendants maintain that it is irrelevant to the instant case where no criminal sanctions are involved in commitment or hospitalization of mentally retarded persons. But *Robinson* cannot be read so narrowly.

Although the Court in *Robinson* focused upon "status" as a *criminal* offense, 370 U.S. 660, 676, 82 S.Ct. 1417, 8 L.Ed.2d 758 (Douglas, J., concurring), its doctrine applies to various kinds of noncriminal incarceration based on mere "status." Rouse v. Cameron, *supra*, 373 F.2d at 453, n. 12; Inmates of Boys' Training School v. Affleck, *supra*, 1371–1372; United States v. Walker, *supra*, 708; United States v. Jackson, *supra*, 6; Nason v. Superintendent, Bridgewater State Hospital, *supra*, 353 Mass. at 611–612, 233 N.E.2d at 912–913. The plaintiffs in the instant action are not criminals; they are victims of uncontrollable "status."

If they are subject to "detention for mere illness—without a curative program," Martarella v. Kelley, *supra*, 349 F.Supp. at 599, plaintiffs will be within the ambit of the *Robinson* proscription. While *Robinson* turned on the Eighth Amendment, in the context of civil commitment in the instant case it is the due process clause that would compel that minimally adequate treatment be afforded the plaintiffs. *See* Rouse v. Cameron, *supra*, 373 F.2d at 453; Wyatt v. Stickney, 325 F.Supp. 781, 784; 344 F.Supp. 387, 390.

Although the Supreme Court has never explicitly recognized this principle, *but see* Martarella v. Kelley, *supra*, 349 F. Supp. at 599, its decisions subsequent to

*Robinson* support the reasoning of *Wyatt* and cases that have subscribed to its views. As the Court, said in Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972), the due process clause, at the very least, "requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *See also* McNeil v. Director, Patuxent Institution, 407 U. S. 245, 250, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972); Inmates of Suffolk Jail v. Eisenstadt, 360 F.Supp. 676, 686 (D. Mass.1973); Hamilton v. Love, 328 F. Supp. 1182, 1191 (E.D.Ark.1971).

*Jackson* and *McNeil* dealt primarily with procedural matters.[6] But they have been interpreted to have substantive import. Davy v. Sullivan, *supra*, 1329–1330; Martarella v. Kelley, *supra*, 349 F. Supp. at 601–602; Inmates of Boys' Training School v. Affleck, *supra*, 1371–1372. *Robinson* and progeny establish that treatment is the only constitutionally permissible purpose for civil confinement, Wyatt v. Stickney, *supra*, 325 F. Supp. at 784. It follows therefore, that under *Jackson* and *McNeil*, the plaintiffs have a right to receive such treatment. Without it, being hospitalized for mental retardation would be equivalent to placement in "a penitentiary where one could be held indefinitely for no convicted offense." Ragsdale v. Overholser, 108

U.S.App.D.C. 308, 281 F.2d 943, 950 (1960).

In light of these decisions by the Supreme Court and the lower Federal and State courts, it can no longer validly be said that the instant action goes up to and beyond the "forefront of the law." Burnham v. Department of Public Health of the State of Georgia, *supra*, 1338. *Compare* Martarella v. Kelley, *supra*, 349 F.Supp. at 599. There is, in short, a growing body of law recognizing a constitutional right to treatment for persons confined in various settings under State authority without having been found culpable of criminal conduct. For the aforementioned reasons, the Court concurs in this view.

The evidence in this case has indicated that Cambridge has made substantial progress over the last decade or more in medical treatment, training, living conditions, record keeping, and personal liberties granted to its residents. From an institution geared primarily to mere sustenance, it has attempted, and in some respects succeeded, in improving and enriching the lives of its residents.

In so doing its officials and the defendants herein have acted in good faith. They have, however, found themselves constrained within the limitations imposed upon them by the State legislature with regard to funding ¢and other resources.[7]

6. *Jackson* involved a challenge to the Indiana procedure for pretrial commitment of incompetent criminal defendants under Ind.Ann. Stat. § 9–1706(a). The Supreme Court held, *inter alia*, that the indefinite commitment of a criminal defendant solely on account of lack of capacity to stand trial violates due process. It ruled that a ·defendant cannot be held more than a reasonable time necessary to determine whether there is a substantial probability that he will attain competency in the foreseeable future. If it is determined that he will not, the State must institute civil commitment proceedings or release the defendant. 406 U.S. 715, 731–739, 92 S.Ct. 1845, 32 L.Ed.2d 435. The case was reversed and remanded for determination of the criminal charges against the petitioner. *Ibid.*, 739–741, 92 S.Ct. 1845.
In *McNeil*, after expiration of the petitioner's five year criminal assault sentence he was

kept in continual confinement, by ex parte order, for an examination to determine whether he should be committed for an indefinite period pursuant to the Maryland Defective Delinquency Law, Md.Ann.Code, Art. 31B (1971). On his motion for postconviction relief, the Supreme Court relied heavily on *Jackson* in holding that the absence of procedural safeguards commensurate with long term commitment violated the due process clause. He was, therefore, ordered released. 407 U.S. 245, 252, 92 S.Ct. 2083, 32 L.Ed.2d 719.

7. Illustrations of Cambridge's unfulfilled financial desires are found in comparing its various biennial requests with actual legislative appropriations. For the 1969–1971 biennium, Cambridge sought $273,524 for special equipment; it received $42,095. For the following biennium, it requested $159,799

But good faith is not at issue here. "[R]ather the issue is of the protection of the constitutional rights" of the residents. Inmates of Boys' Training School v. Affleck, *supra,* 1374; *see also* Rozecki v. Gaughan, 459 F.2d 6, 8 (1st Cir. 1972). It does not suffice, therefore, to show that conditions have been upgraded at Cambridge, that the situation will continue to improve in the future, and that even more achievements would be forthcoming were it not for the restrictions imposed by the legislature. It is the Court's duty, under the Constitution, to assure that every resident of Cambridge receives at least minimally adequate care and treatment consonant with the full and true meaning of the due process clause.

The Court is mindful of the practical limits of its abilities to resolve what is essentially a question of conflicting legislative priorities. *See* New York State Association for Retarded Children, Inc. v. Rockefeller, *supra,* 764–765. This, in turn, is traceable to competing political demands among the score of interest groups contending for the limited resources available from the fisc. *See* Friendly, "The Law of the Circuit" And All That, 46 St. John's L.Rev. 406, 410 (1972).

The State is not constitutionally obligated to provide services to its citizens. *Cf.* Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Nor may a Court "second-guess state officials charged with the difficult responsibility of allocating limited . . . among the myriad of potential recipients." *Ibid.,* 487, 90 S.Ct. 1163.

---

for equipment; it received $46,038. For the current 1973–1975 biennium, it sought $106,-297 for special equipment; it received $42,000.

Appropriations decisions by the legislature also are at the root of the reduction and apparent shortage of staff personnel at Cambridge. The 1971 session of the legislature eliminated about 550 positions in the ten State hospitals. A freeze imposed on hiring State employees in October 1972 further exacerbated the situation, although it has been modified to permit replacement of some personnel upon approval by an administrative board. Compare Wyatt v. Stickney, *supra,* 325 F.Supp. at 783.

As a result of these developments, Cambridge, which had requested 98 additional staff positions for the 1971–1973 period, lost a total of 148 employees (combined with Lake Owasso). Since mid-1971, the institution has had a decrease of more than 170 staff members, mainly direct care employees whose functions are to provide personal care, treatment, and training to residents on a daily basis. During this same time period, the population of the institution declined by about 200 residents. *See* n. 2, *supra.*

Cambridge currently has nearly 600 State-funded employees. Until 1971, the legislature set the staffing complements for Cambridge and the other State hospitals, directly. Now, however, the Department of Public Welfare sets the complements, subject to legislative-prescribed ceilings.

For the current biennium, Cambridge requested 267 additional positions. The Department trimmed this request to 45.

Cambridge does get much needed and apparently valuable help from volunteers, mainly high school age children. During the first half of 1973, some 650 volunteers contributed more than 14,000 hours of work at the institution. Additionally, more than 50 adult participants in a State-Federally financed Foster Grandparent Program provide up to four hours of daily intimate care for residents at Cambridge. Further personnel resources come from the 33 certified teachers (and 32 aides) who instruct some 260 children under 21 years of age at Cambridge in the public school program operated under the 1972 Trainable Mentally Retarded Act. M.S.A. §§ 120.03 subd. 4, 120.17.

Testimony by the Director of Administrative Management of the Bureau of Residential Services of the Welfare Department indicated that in fiscal year 1971–1972, the ten State hospitals generated a surplus in excess of $400,000 and in excess of $1.3 million in fiscal year 1972–1973. All of these funds were returned to the State treasury. The Commissioner of Public Welfare could have, but did not, approach the Governor's Legislative Advisory Committee in each of these years to request these funds, or a portion of them, for additional hiring purposes. No such surplus will be available for fiscal year 1973–1974. It is anticipated that whatever surplus is generated during this period will help fund the 300 new staff positions provided by the legislature for the State hospitals.

But Federal courts have on occasion forced additional expenditures on State agencies to remedy constitutional violations. *See, e. g.,* Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Holt v. Sarver, 442 F.2d 304, 306–307 (8th Cir. 1971). The guiding principle of this delicate intersection of federalism is that "[i]nadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights." Inmates of Suffolk County Jail v. Eisenstadt, *supra,* 687. *See also* Rozecki v. Gaughan, *supra,* 8; Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1960); Martarella v. Kelley, *supra,* 359 F.Supp. at 481; Wyatt v. Stickney, *supra,* 344 F.Supp. at 377; Brenneman v. Madigan, 343 F.Supp. 128, 139 (N.D.Cal.1972); Hamilton v. Love, *supra,* 1194.

In holding that plaintiffs possess a right under the due process clause to receive adequate treatment, the Court is not undertaking to "create substantive constitutional rights," as was proscribed in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 33, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). *See also* Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). Defendants advance these cases for the proposition that questions involving the quality and quantity of services to be provided by the State to its citizens are essentially State concerns, not governed by the Constitution. Dealing essentially with the equal protection clause, those cases are inapplicable here.

The absence of any explicit or implicit textual right to treatment in the Constitution is not determinative. *Compare* San Antonio Independent School District v. Rodriguez, *supra,* 411 U.S. at 33–34, 93 S.Ct. 1278. The contention in this case is that the right is embodied within the concept of due process.

The only meaningful way that the issue may be approached is by inquiring "whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Four-teenth Amendment." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). *See also* Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Because of the huge deprivation of personal freedom attendant involuntary civil commitment, Humphrey v. Cady, *supra,* 405 U.S. at 509, 92 S.Ct. 1048, plaintiffs clearly are suffering a "grievous loss" of liberty. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), *quoted* in Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Just as a myriad of other "rights" have been found to have evolved under the due process clause without expressly being proclaimed in the text of the Constitution, *e. g.,* Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), so, too, must it embody the principle being asserted here by plaintiffs. Having determined that "some process is due," the Court may hereafter use the flexibility of the concept of due process in determining the scope of plaintiffs' rights. Morrissey v. Brewer, *supra,* 408 U.S. at 481, 92 S.Ct. 2593.

It is not disputed that the State could close its institutions for the mentally retarded without offending the Constitution. San Antonio Independent School District v. Rodriguez, *supra*; Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971). But the State cannot be permitted to affirmatively confine or institutionalize these persons on the basis of noncriminal status without providing them with adequate treatment.

In sum, the Court is merely holding that due process requires that civil commitment for reasons of mental retardation be accompanied by minimally adequate treatment designed to give each committed person "a realistic opportunity to be cured or to improve his or her mental condition." Wyatt v. Stickney, *supra,* 325 F.Supp. at 784.

The specific components of this right, whether this right has in fact been violated at Cambridge and, if so, how it can be remedied remain to be resolved by subsequent findings, conclusions, and orders of this Court.

## II. *Statutory Right to Treatment.*

■ The Minnesota Hospitalization and Commitment Act, under which the plaintiffs and members of the class they seek to represent are involuntarily committed, defines a mentally deficient person as one who, although not mentally ill, "require[s] treatment or supervision for his own or the public welfare." M. S.A. § 253A.02 subd. 5. A person found to be mentally deficient, upon commitment, comes under the care and custody of the Commissioner of Public Welfare. M.S.A. § 253A.07 subd. 17(b). As guardian of the committed person, the Commissioner may thereafter place the person in "an appropriate home, hospital, or institution, or exercise general supervision over him anywhere in the state outside of any institution" through a county welfare board or other appropriate agency authorized by the Commissioner. M.S.A. § 253A.07 subd. 18.

Plaintiffs contend that these provisions create a statutory right to treatment upon being involuntarily committed. Defendants argue that these provisions, particularly the one defining mentally deficient persons, permit institutionalization for the self-protection of the committed person or for the public safety, without necessarily requiring treatment.

Although custodial safekeeping for the protection of the retarded persons or society at large may be a purpose for which the Act legitimately authorizes commitment, *see* Humphrey v. Cady, *supra*, 405 U.S. at 509, 92 S.Ct. 1048, the Act as a whole appears to contemplate that adequate treament be provided upon commitment. "Hospital," one of the alternative places for disposition of committed persons provided to the Commissioner under § 253A.07 subd. 18, is defined in the Act as a facility "equipped to provide care and treatment" for its residents. M.S.A. § 253A.02 subd. 8. Therefore, at the very least, if the Commissioner chooses to hospitalize a person committed to her care and custody under the Act, that person has a statutory right to receive adequate treatment.

A 1973 amendment to the Act further demonstrates the legislative intention to provide treatment for the mentally deficient, extending it to all persons coming within the ambit of the Act. In pertinent part, it provides as follows:

> "Every person *hospitalized or otherwise receiving services* under this section shall be entitled to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further custody, institutionalization or other services unnecessary." Minn.Stats. ch. 552, Sess.Laws, 1973 (emphasis supplied)

This legislative mandate also is reflected in Rule 34, adopted by the Department of Public Welfare following the amendment in 1971 of M.S.A. § 252.28 to impose upon the Commissioner licensing duties for facilities serving the mentally retarded.[8] In spelling out the

---

8. Following enactment of the licensing statute, a 25 person advisory board was organized to draft guidelines to be used by the Commissioner in sanctioning private and public facilities for the mentally retarded. Since Rule 34 went into effect in November 1972, 115 facilities have been granted licenses under its provisions. All six residential units at Cambridge State Hospital, excluding the infirmary, have been granted provisional licenses, conditioned upon rectifying certain deficiencies.

Some of the corrections required by March 1974 directly concern care and treatment of residents. These include development of improved individual program plans, development of full time structured programs, and provision of facilities in which residents may keep personal belongings.

Various physical plant modifications also are required by July 1, 1976. These include structuring of a cottage unit system, *i. e.*, small groups of one to six residents in each physically identifiable unit structure, with a

guidelines for the granting of such licenses, Rule 34 sets forth various elements of treatment that must be provided by these facilities. *See* Department of Public Welfare Rule 34—Standard For The Operation Of Residential Facilities And Services For Persons Who Are Mentally Retarded, at 19–21.

In sum, the Minnesota legislature has prescribed that all mentally deficient persons committed to the care and custody of the Commissioner of Public Welfare are to receive adequate care and treatment. This statutory right to treatment exists apart from the constitutional rights being asserted here.

### III. *Least Restrictive Alternatives.*

■ Hospitalization only as a last resort is the essence of plaintiffs' claim to a right of least restrictive alternatives under the due process clause. They contend that defendants are obligated to seek out and develop community based facilities for the placement of involuntarily committed retarded persons. Although the Supreme Court has previously rejected this theory as not constituting a substantial Federal question, State v. Sanchez, 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed. 469 (1970), *dismissing for want of substantial federal question* 80 N.M., 438, 457 P.2d 370 (1968); this does not necessarily preclude its assertion here.

The Supreme Court has on occasion dismissed a case on this ground only to deal with the same issue in subsequent appeals. Compare Walz v. Tax Commission of the City of New York, 397

U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), with General Finance Corporation v. Archetto, 93 R.I. 392, 176 A.2d 73, 76–79 (1961), appeal dismissed for want of substantial Federal question, 369 U.S. 423, 82 S.Ct. 879, 8 L.Ed.2d 6 (1962); compare McGowan v. Maryland, 366 U.S. 420, 425–428, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), with Commonwealth v. Grochowiak, 184 Pa.Super. 522, 527–528, 136 A.2d 145, 148 (1957), appeal dismissed for want of substantial Federal question, 358 U.S. 47, 79 S.Ct. 40, 3 L.Ed.2d 44 (1958), and State v. Towery, 239 N.C. 274, 277–278, 79 S.E.2d 513, 516 (1954), appeal dismissed for want of substantial Federal question, 347 U.S. 925, 74 S.Ct. 532, 98 L.Ed. 1079 (1954). *See also* Two Guys from Harrison-Allentown, Inc. v. McGinley, 179 F.Supp. 944, 951–952 (E.D.Pa.1959), aff'd 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961) (apparently viewing Supreme Court's prior dismissal for want of substantial Federal question as highly persuasive but not dispositive).

Moreover, "doctrinal developments" in the last five years since the dismissal in *Sanchez* diminish the potency of the Supreme Court's disposition in that case. *See* Ahern v. Murphy, 457 F.2d 363, 365 (7th Cir. 1972); Heaney v. Allen, 425 F.2d 869, 871 (2d Cir. 1970); Port Authority Bondholders Protective Committee v. Port of New York Authority, 387 F.2d 259, 263, n. 3 (2d Cir. 1967). The ramifications of *Rouse* and progeny were only beginning to make themselves felt at the time that *Sanchez* was dismissed. More recent cases such as *Wyatt* create

---

maximum of four persons per sleeping room. The former State director of mental retardation licensing has estimated that it will cost about $75,000 to bring the physical plant up to the Rule 34 requirements, plus another $75,000 at the Lake Owasso annex. Plaintiffs concede that Rule 34 provides adequate standards of care and treatment. But they question whether its provisions can and will be satisfied at Cambridge. They also point out that the Rule does not contain any standards regarding staffing of facilities. Minimum staffing levels were included in proposed amendments to Rule 34, issued

last year by the Commissioner, but they have subsequently been withdrawn.

Although closure of the Cambridge facility due to noncompliance with Rule 34 is a possibility, this does not appear to be a realistic option facing the State. *See* Employees of Department of Public Health and Welfare v. Department of Public Health and Welfare, 452 F.2d 820, 827 (8th Cir. 1971), aff'd 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). Alterations of the current provisions or extensions of time in which to comply with these requirements appear more likely.

a new tint through which the rights of the mentally retarded may be viewed.

Although some of today's doctrinal positions antedated *Sanchez, e. g.,* Birnbaum, The Right to Treatment, *supra,* the law concerning the rights of the involuntarily committed and State-institutionalized persons has come a long way in the past four years. For these reasons, the dismissal in *Sanchez* cannot be regarded as compelling denial of the claim to least restrictive alternatives to hospitalization asserted in this action.

The root of plaintiffs' argument is that mentally defective persons who have not committed any criminal acts "cannot be totally deprived of their liberty if there are less drastic means" for achieving the same basic goals of protecting and treating them. Lessard v. Schmidt, 349 F.Supp. 1078, 1096 (E.D.Wis.1972) (three judge court), vacated and remanded on other grounds, 414 U.S. 473, 94 S. Ct. 713, 38 L.Ed.2d 661 (1974). The courts that have adopted this rationale generally have followed the same reasoning as in right to treatment cases.

In Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657 (1966), the Court found a statutory right to least restrictive alternatives regarding dispositions of persons considered to be mentally ill. The case was remanded to allow the District Court to inquire, under the 1964 Hospitalization of the Mentally Ill Act (Supp. V. 1966), into "other alternative courses of treatment" besides involuntary hospitalization. 364 F.2d at 661.

In Covington v. Harris, *supra,* the Court found a right to least restrictive alternatives as to dispositions internally within a mental hospital, again basing its holding on statutory grounds. But *Covington* clearly had constitutional overtones, suggesting that the absence of such statutory right could amount to deprivation of due process. 419 F.2d 617, 623. Subsequent cases have applied the doctrine to a variety of dispositions and conditions within nonpenal public institutions. *See, e. g.,* Inmates of Suffolk County Jail v. Eisenstadt, *supra,* 686

(pretrial detainees); Inmates of Boys' Training School v. Affleck, *supra,* 1369 (juvenile offenders); Brenneman v. Madigan, *supra,* 138 (pretrial detainees); Hamilton v. Love, *supra,* 1192 (pretrial detainees). *See also* Dixon v. Attorney General of Commonwealth of Pennsylvania, 325 F.Supp. 966, 973–974 (M.D. Pa.1971) (three judge court).

These cases demonstrate the widespread acceptance by the courts of a constitutional duty on the part of State officials to explore and provide the least stringent practicable alternatives to confinement of noncriminals. As applied to involuntary civil commitment these options from placement of the committed person in the custody of a friend or relative to disposition within a private facility. Lessard v. Schmidt, *supra,* 1096; Wyatt v. Stickney, *supra,* 344 F.Supp. at 386.

The Minnesota Hospitalization and Commitment Act provides for certain dispositions as alternatives to involuntary hospitalization. M.S.A. § 253A.07 subd. 18. The due process clause does no more than require that State officials charged with obligations for the care and custody of civilly committed persons make good faith attempts to place such persons in settings that will be suitable and appropriate to their mental and physical conditions while least restrictive of their liberties. Covington v. Harris, *supra,* 419 F.2d at 623; Lessard v. Schmidt, *supra,* 1096; Wyatt v. Stickney, supra, 344 F.Supp. at 386.

IV. *Other Claims.*

Plaintiffs' other claims under the due process clause and the cruel and unusual punishment clause of the Eighth Amendment may best be viewed in concert with the Court's findings of facts. Close scrutiny of those issues and their applications to the instant case, therefore, will be deferred pending the Court's findings and conclusions of law.

For present purposes, it suffices to observe that plaintiffs have a right, whether grounded on due process or the Eighth Amendment, or both, to a hu-

mane and safe living environment while confined under State authority. New York State Association for Retarded Children, Inc. v. Rockefeller, *supra,* 764; Gates v. Collier, 349 F.Supp. 881, 894 (N.D.Miss.1972); Holt v. Sarver, 309 F.Supp. 362, 384 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971). Included in this right are protection from assaults or other harms from fellow residents, reasonable access to exercise and outdoor activities, and basic hygienic needs. New York State Association for Retarded Children, Inc. v. Rockefeller, *supra,* 764–765.

■ Several specific practices and conditions currently existing at Cambridge also draw into question the plaintiffs' rights under the Eighth Amendment. In particular, there has been evidence of widespread practices of secluding residents in barren "isolation" rooms without being strictly supervised or monitored. Two cases have considered seclusion for the mentally retarded to be totally impermissible in any form. New York State Association for Retarded Children, Inc. v. Rockefeller, *supra,* 768; Wyatt v. Stickney, *supra,* 344 F.Supp. at 400. This is the position taken by the Accreditation Council for Facilities for the Mentally Retarded, composed of several professional organizations that comprise the Joint Commission on Accreditation of Hospitals. Standards for Residential Facilities for the Mentally Retarded, § 2.1.8.5, at 21 (1971).

In other contexts courts also have condemned seclusion practiced in a form comparable to that existing at Cambridge, and they have strictly limited the circumstances and conditions under which it may be employed. Morales v. Turman, *supra,* 177 (juvenile offenders); Nelson v. Heyne, 355 F.Supp. 451, 455–456 (N.D.Ind.1972) (juvenile offenders), aff'd 491 F.2d 352 (7th Cir. 1974); Gates v. Collier, *supra,* 900 (prisons); Collins v. Schoonfield, 344 F.Supp. 257, 269 (D.Md.1972) (prisons); Lollis v. New York State Department of Social Services, 322 F.Supp. 473, 483 (S.D.N.Y.1970), modified 328 F.Supp. 1115, 1119 (S.D.N.Y.1971) (juvenile offenders); Jordan v. Fitzharris, 257 F.Supp. 674, 683–684 (N.D.Cal.1966) (prisons).

Utilization of various forms of physical restraints also may be violative of plaintiffs' Fourteenth and Eighth Amendment rights when employed to control behavior without first attempting less restrictive measures. Wheeler v. Glass, 473 F.2d 983, 987 (7th Cir. 1973); Inmates of Boys' Training School v. Affleck, *supra,* 1369; Wyatt v. Stickney, *supra,* 344 F.Supp. at 401. This view also comports with the position of the Accreditation Council. *See* Standards for Residential Facilities for the Mentally Retarded, *supra,* § 2.1.8.6, at 21. The evidence has revealed that a variety of such devices are employed at Cambridge, ostensibly for the self-protection of residents and also attributable to shortages in staff to attend to residents who are otherwise likely to cause harm to themselves or others.

Excessive use of tranquilizing medication as a means of controlling behavior, not mainly as a part of therapy, may likewise infringe on plaintiffs' rights under the Fourteenth Amendment and the Eighth Amendment. Nelson v. Heyne, *supra,* 455; Wyatt v. Stickney, *supra,* 344 F.Supp. at 400. The evidence also indicates that this situation apparently prevails at Cambridge, primarily for the same two reasons as predicate the use of physical restraints: self-protection of residents and insufficient staffing.

■■ Apart from these questionable practices and procedures, the overall conditions of plaintiffs' confinement may amount to a violation of the cruel and unusual punishment clause. Not restricted solely to particular kinds of punishment inflicted, the Eighth Amendment

"also applies to mere confinement to an institution which is 'characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people.'" Martarella v. Kelley, *supra,* 349 F.Supp. at 597, quoting Holt v. Sarver, *supra,* 309 F.Supp. at 373.

As with the right to treatment and the right to least restrictive alternatives, determination of whether particular practices and conditions at Cambridge in fact violates these rights must await further determination by this Court. Having set forth its views on the pertinent law governing this case, the Court will consult with counsel for both sides within 20 days of the entry of this decision. At that time, further views may be offered as to the Court's findings of fact and conclusions of law and what relief, if any, may be accorded.