## In re Joyce Z.

*Stephen A. Zapalla, James A. Esler* and *Allan Gross,* for petitioners.

*Ira M. Mazer, Max A. Levine* and *L. Dennis Revak,* for respondents.

*Louis Kwall,* for Pennsylvania Department of Public Welfare.

COHILL, *J.*, March 31, 1975 — The facts of this case are simple but tragic. Joyce Z., born June 23, 1961, was declared to be a dependent and neglected child by this court on December 3, 1969. She had a learning disability, an I.Q. of 61 and was described as "mildly retarded" by her Allegheny County Child

Welfare Services (CWS) caseworker. CWS placed her in a foster home, and she seemed to be progressing pretty well until July 30, 1970.

On that date, she was in an organized swimming program at a pool near her foster home. There was an accident; Joyce nearly drowned and was rushed to North Hills Passavant Hospital where they managed to revive her. She was transferred to Children's Hospital of Pittsburgh where she stayed for about two months; then she was placed at the Home for Crippled Children, Pittsburgh, Pa., where she resided at the time this petition was filed.

Joyce suffered serious brain damage as a result of the accident. Psychological tests after the accident revealed that her I.Q. had dropped from 61 to 39. In September 1974, one month prior to the hearing in this matter, a psychologist at the Home for Crippled Children tested Joyce again. Her chronological age at that time was thirteen years, three months; her mental age scale was only eight months, and she had an I.Q. of five.

The Home for Crippled Children is a private institution offering therapeutic services to children suffering from physical and/or mental disabilities. The staff at the home felt that Joyce had received the maximum benefits from their program and requested that other arrangements be made for her residence so that the space she occupied might be given to a child who could benefit more from their program.

Joyce's caseworker from CWS and her caseworker from Allegheny County Mental Health/ Mental Retardation Program (MH/MR) thereupon jointly filed a petition for a civil court commitment under section 406 of the Mental Health and Mental Retardation Act of October 20, 1966, P.L. (Spec. Sess.) 96, 50 P.S. §4102, suggesting Western State

School and Hospital as a proper facility for her commitment.

A hearing on the petition was held on October 9, 1974. This court entertains no doubt that Joyce is a profoundly retarded child suffering from a "mental disability" as defined in section 102 of the Mental Health and Mental Retardation Act of 1966, and she may, therefore, be committed to a suitable facility under the provisions of that act. The psychiatric report of W. Lindsay Jacob, M.D., admitted into evidence without objection, stated, in part:

"Joyce was confined to a wheelchair during the examination, and although she was able to respond to me with some gestures, smiles, and appropriate noises, she has no usable speech whatsoever. She was able to follow a few very simple commands, but displayed no judgment or any real awareness of why she was spending the time with me. . . . Joyce has relatively little, if any, bowel and bladder control, and has to be toileted fairly regularly because she cannot let the staff know when she has to go. She has poor coordination and can't feed herself . . . During the intensive care she received at North Hills Passavant Hospital and later at Children's Hospital immediately following the accident, her EKG at one point was entirely flat. She was responding in a few days time, but never spoke again, and her condition has been essentially unchanged over the past few years. I feel that Joyce's diagnosis is organic brain syndrome due to anoxia of drowning, superimposed on a previous microcephaly. The damage she has suffered is what appears to be massive and global, and there is little chance that she will show more recovery than she has already. The youngster will require custodial care with moderately skilled physical care for the rest of her life."

On the basis of this evidence, we could have ordered Joyce committed to Western State School and Hospital immediately, as prayed for in the petition under consideration here. There was, however, compelling evidence and testimony adduced at the hearing which convinced us that if Joyce were committed to Western State School and Hospital, a grave injustice to this child would be perpetrated.

Mr. Robert Hiltner, Superintendent of Western State School and Hospital, testified that if Joyce were committed there, she would be placed in a unit with about 40 other children, most of whom would be in wheelchairs, and "more often than not" there would be only two child-care aides in her unit. He further testified that such units were designed for a maximum of 28 children but that most had populations "running forty and up."

We note, parenthetically, that on November 19, 1974, we made an unannounced visit to Western State School and Hospital and found the conditions there to have been accurately described in Mr. Hiltner's testimony. The entire time we were in the unit to which Joyce would have been assigned, two aids did nothing but change diapers on one large teenager after another, having no time to interact with or stimulate any of the children except during the time they were diapering them.

We were most favorably impressed with the dedication of the staff we saw working there and likewise by the honesty of Mr. Hiltner's testimony. He had obviously made no attempt to cover up the gross deficiencies of the institution. We were certainly unfavorably impressed with the lack of staff and overcrowded conditions which we observed there.

Charles Peters, Commissioner of Mentally Re-

tarded for the Department of Welfare, Western Region, testified that Western State School and Hospital is under his administrative and programmatic supervision. He testified that Western State School and Hospital would be suitable for a child like Joyce only if there were 150 less patients there. In addition, he stated that the private licensed facilities in the Western Region of Pennsylvania are 250 beds over their appropriate capacity right now. He also said that, in his opinion, Joyce's regression would continue if she were placed at Western State School and Hospital because of the impossibility of interaction with her by the limited staff.

Mrs. Virginia Thornburgh, President of the Allegheny Chapter of the Pennsylvania Association for Retarded Citizens (PARC), testified that in her opinion a placement of *anybody* at Western State School and Hospital at this time would be inappropriate. We agree.

Joyce's MH/MR caseworker, Mr. Paul DeWalt, testified that he had exhausted all known potential places of referral without success and stated that the petition for commitment under the Mental Health and Mental Retardation Act of 1966 was "the only option left."

Mr. Hiltner, the Superintendent of Western State, testified that it would cost $42 per day to keep Joyce in the appropriate unit of that hospital. The prevailing foster home per diem rate in Allegheny County at that time was $3.75 plus free medical care and a clothing allowance.

It appeared from testimony at the hearing that it might be possible to obtain a suitable foster home for Joyce for more than $3.75 per day but probably for less than $42.

The county commissioners establish and pay the

foster home rate in Allegheny County. The Commonwealth pays the entire cost of care of the patients at Western State School and Hospital.

At the conclusion of testimony on October 9, we entered the following findings of fact, conclusions of law and order:

"And now, to-wit, this 9th day of October, 1974, after hearing the Petition of Terrance McDaniels of Child Welfare Services of Allegheny County (hereinafter called 'CWS') and Paul DeWalt of Allegheny County Mental Health/Mental Retardation (hereinafter called 'MH/MR') for a Civil Court Commitment of Joyce Z. under Section 406 of the Mental Health and Mental Retardation Act of 1966, this Court makes the following Findings of Fact, Conclusions of Law and Order:

## "FACTS

"1. Joyce Z. is a severely retarded child in need of placement outside her home.

"2. Said child is presently in placement at Home for Crippled Children, Pittsburgh, Pennsylvania.

"3. Said child has received the maximum benefits of the program of the Home for Crippled Children and cannot stay there indefinitely.

"4. No private agency or private institution is known which will provide appropriate care for said child.

"5. The only public institution which can take said child is Western State School and Hospital, Canonsburg, Pennsylvania.

"6. Western State School and Hospital is so overcrowded and understaffed that it would be detrimental to said child to commit her there.

## "CONCLUSIONS OF LAW

"1. Said child has an individual and a constitutional right to regenerative treatment.

"2. To commit said child to Western State School and Hospital will deprive her of her individual and constitutional right to treatment.

"ORDER

"1. CWS and MH/MR will cooperate and use their best efforts to recruit foster parents to provide a suitable foster home for said child in Allegheny County, Pennsylvania.

"2. The methods to be used for this recruitment may include but shall not be limited to advertising in local newspapers, contacting private and public welfare agencies for assistance and requesting assistance in this recruitment from the Pennsylvania Department of Public Welfare.

"3. The per diem board rate to be paid to the foster parents so recruited shall be negotiated by MH/MR with said foster parents.

"4. When agreement on a board rate is reached the Allegheny County Institution District, as its share, shall contribute the current per diem foster home board rate paid to other foster homes in Allegheny County; MH/MR shall pay the balance.

"5. The appropriate representatives of CWS and MH/MR shall report to this court at 10 A.M. Wednesday, October 30, 1974 as to the progress they have made in obtaining a suitable foster home for said child.

"6. Said child shall remain at Home for Crippled Children pending further order of court."

The second hearing was postponed from October 30 and held on November 8, 1974, to inform the court of what progress had been made in finding a suitable residence for Joyce. The facts adduced at that hearing represent a sad commentary on the state of facilities for mentally retarded children in Western Pennsylvania. CWS had run newspaper ads for prospective foster parents for Joyce. There

were 29 responses, but, for one reason or another, none were suitable. Mr. DeWalt (Joyce's MH/MR caseworker) checked out approximately 20 institutional-type facilities of various sorts; none could take Joyce, generally because of overcrowding, but some refused because Joyce's physical needs were so great that they didn't have the staff to give her proper care.

At the November 8 hearing, Mr. Charles Bisdee, President of the Home for Crippled Children, indicated that a nurse on his staff, who was well acquainted with Joyce and familiar with her needs, might, along with her husband, be interested in assuming the role of foster parents for Joyce. She had offered to quit her job in order to care for Joyce if a suitable board rate could be arranged.

We verbally directed CWS and MH/MR to negotiate with her and her husband, authorized them to offer a per diem rate of $35 and again continued the case.

On December 6, 1974, the final hearing was held. The nurse and her husband, Mr. and Mrs. "R.T.", agreed to provide a foster home for Joyce, and we entered the following interlocutory decree:

"AND NOW, to-wit, this 6th day of December, 1974, after hearing, it appearing to this Court that Child Welfare Services of Allegheny County (hereinafter called 'CWS') and Allegheny County Mental Health and Mental Retardation Program (hereinafter called 'MH/MR') have found the R. T. foster home (hereinafter called the 'foster home') to be suitable to meet the needs of Joyce Z., the child in question, at a per diem board rate of $35.00 and it further appearing that there are unresolved questions of law pertaining to what public agency (i) should provide ongoing casework services for

Joyce, her parents and said foster parents; (ii) should pay the foster home board rate; and (iii) should provide for other physical needs of Joyce; NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

"1. Joyce is to be placed in the foster home as soon as possible.

"2. Pending a final order in this matter CWS will pay the prevailing County foster home per diem rate (currently $3.75) toward the foster home payments for Joyce.

"3. Pending a final order in this matter MH/MR will pay the difference between $35.00 and the prevailing County foster home per diem rate.

"4. MH/MR will pay any cost not covered by Medical Assistance or third party carriers for:

"a. psychiatric, psychological, social work, rehabilitative training, sheltered workshop services and any other service needed by Joyce and authorized by the Mental Health and Mental Retardation Act of 1966 and Regulations thereunder;

"b. transportation for Joyce to and from the location of such services;

"c. those drugs prescribed specifically for a mental disorder;

"d. general medical care, prosthetic appliances, special equipment and clothing.

"5. CWS will apply for a 'White foster care child card'* for Joyce for medical assistance.

"6. CWS and MH/MR shall jointly provide casework services for Joyce, her parents and foster parents pending the entry of a final order in this matter.

"7. Counsel for CWS, MH/MR, the Pennsylvania

---

*This refers to the color of the card, not the race of the child.

Department of Public Welfare and any other party who wishes to file a brief amicus curiae in this matter, shall file briefs with this Court on or before December 27, 1974."

There are three questions at issue here:

1. Does Joyce have an individual and constitutional right to regenerative treatment?

2. What public agency should provide ongoing casework services for Joyce, her parents and foster parents?

3. What public agency should pay for and otherwise provide for the physical needs of Joyce?

## I.  RIGHT TO TREATMENT

Joyce has an individual and constitutional right to regenerative treatment.

The Mental Health and Retardation Act of 1966 was passed for the benefit of those unfortunate citizens of this Commonwealth who suffer mental disabilities; it is based on humanitarian ideals, but it involves the potential restriction of the affected individual's liberty. If the State intervenes in an individual's life by having that person committed to an institution, there is a corresponding obligation on the State to provide treatment services to the person affected: Welsch v. Likins, 373 F. Supp. 487 (D. Minn. 1974); N.Y. Assn. for Retarded Children, Inc. v. Rockefeller, 357 F. Supp. 752 (E.D.N.Y. 1973).

In the usual "right-to-treatment" case, an inmate of an institution brings an action alleging that he has been deprived of his liberty and has not received adequate treatment in the institution. Failure to provide adequate treatment to an inmate of a mental institution is a violation of due process:

Wyatt v. Stickney, 325 F. Supp. 781 (M.D. Ala. 1971) (related cases at 334 F. Supp. 1341 (1971); 344 F. Supp. 383, 387 (1972)). In that case, the court said: "To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process." 325 F. Supp. at 785.

In the instant case, we have a somewhat different situation. We have allegations that a child will not receive adequate treatment if she is committed. So far as we know, this is a case of first impression in Pennsylvania. All of the witnesses, including the superintendent of the institution itself, testified that Joyce would *not* receive adequate treatment if committed to Western State School and Hospital. There were no witnesses who testified that Joyce would receive adequate treatment if committed there.

It is apparent that to commit Joyce to Western State School and Hospital, whose own administrator admits that she would not receive proper treatment there, would be to deprive Joyce of her fundamental right of due process.

What then should be done with Joyce? It has been held that in mental health cases the committing court has an obligation to consider a range of alternative courses of treatment: Lake v. Cameron, 364 F. 2d 657 (D.C. Cir. 1966). The juvenile courts have a tradition of acting in loco parentis and they are particularly suited to order relief which is treatment-oriented. Treatment is the entire premise underlying the juvenile justice system. See Kent v. U.S., 383 U.S. 541 (1966); In re Gault, 387 U.S. 1 (1967); In re Winship, 397 U.S. 358 (1970); McKeiver v. Pennsylvania, 403 U.S. 528 (1971). We

hold that obtaining treatment for Joyce by the arrangement of placing her in this very special foster home is consistent with this line of cases and in keeping with the tradition of the juvenile justice system.

If Joyce is placed in a foster home rather than an institution, does she still have a right to treatment? Of course she does. Of all the constitutional rights that a United States citizen has, the most basic is the right not to be deprived of life, liberty or property without due process of law. Certainly, any treatment ordered for Joyce is intended to help preserve her life.

In addition, she has a right to treatment bestowed upon her by the legislature of the Commonwealth of Pennsylvania. Article II, sec. 4201 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. §4201, sets forth the general powers and duties of the Department of Public Welfare in connection with mental health and states in part:

"The department shall have power, *and its duty shall be*: (1) To assure within the State the availability and equitable provision of adequate mental health and mental retardation services for all persons who need them, regardless of religion, race, color, national origin, settlement, residence, or economic or social status." (Emphasis supplied.)

These are brave words. We mean to see that the State, acting through the Department of Public Welfare, abides by them.

Joyce has a right to life given to her by the Constitution of the United States; she has a right to treatment given to her by the Mental Health and Mental Retardation Act of Pennsylvania; this court may order that course of treatment best suited to meet Joyce's needs. Following the first hearing, we

directed the local CWS and MH/MR staffs to formulate a suitable plan for Joyce. We are satisfied that they have.

## II. CASEWORK SERVICES

Allegheny County Child Welfare Services and Allegheny County Mental Health/Mental Retardation Program jointly have an obligation to provide ongoing casework services for Joyce, her parents and foster parents.

Joyce first became known to this court on December 3, 1969, when she was found to be a "dependent and neglected" child under the Juvenile Court Law of Allegheny County of June 3, 1933, P.L. 1449, art. 1 et seq., as amended, 11 P.S. §269-1 et seq., and she was placed under the supervision of CWS with permission given to place her in a suitable institution or foster home. It was pursuant to this order that she was placed in the foster home where she was residing at the time of the swimming pool accident in 1970.

There is no dispute that prior to the proceedings initiated under section 406 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. §4406, casework services had to be provided for Joyce by CWS pursuant to the order of court of December 3, 1969.

Counsel for the parents of Joyce argue that since Joyce had previously been found to be dependent and neglected, the obligation of CWS to provide casework services is not abrogated by the petition filed here under section 406 of the Mental Health and Mental Retardation Act of 1966. We agree.

The Juvenile Act of December 6, 1972, P.L. 1464, 11 P.S. §50-101 et seq., repealed the 1933 Juvenile Court Law of Allegheny County. The 1972 Act con-

tains a provision not found in the older act. Section 50-326, 11 P.S. §50-326, provides:

"If. . . at any hearing, the evidence indicates that the child may be subject to commitment or detention under the provisions of the act . . . known as the 'Mental Health and Mental Retardation Act of 1966' the court shall proceed under the provisions of said act."

In the instant case, of course, the original action was initiated pursuant to the 1933 Juvenile Court Law of Allegheny County under which Joyce was found to be dependent and neglected. (Under the Juvenile Act of 1972 she could be found to be a "deprived" child.) The current petition was filed pursuant to the Mental Health and Mental Retardation Act of 1966.

Does a finding that Joyce is suffering from a mental disability under the instant petition mean that she is no longer a legally "dependent and neglected" or "deprived" child? We think not. This would thicken, to an extreme which we do not even care to contemplate, the already unbelievable bureaucratic jungle surrounding the labeling of children in this State.

No testimony was adduced at the hearing to show that Joyce's condition as a dependent and neglected child had changed. Superimposed on that condition, however, are the severe mental and physical disabilities she suffers as a result of the accident. This means that she is now also an appropriate subject for the benefits and provisions of the Mental Health and Mental Retardation Act of 1966. Some of those benefits are short-term inpatient services, outpatient services, emergency services, specialized rehabilitative and training services and many others: 50 P.S. §4301(d). Pursuant to the act,

the county commissioners have established the Allegheny County Mental Health and Mental Retardation Program for these purposes. Centainly implied in these various enumerated services is casework service.

We find, therefore, that Joyce is entitled to casework service from both CWS and MH/MR. We do not wish to imply that CWS and MH/MR may not get together and agree on which agency will provide various services to Joyce in order to eliminate duplication, but Joyce is entitled to the benefits of the services of both agencies.


## III. FOSTER CARE PAYMENT

The Pennsylvania Department of Public Welfare is obligated to pay for and otherwise provide for the physical needs of Joyce.

The answer to this issue lies within the four corners of the Mental Health and Mental Retardation Act of 1966.

There is no disagreement among the parties in this case that Joyce is in need of specialized treatment of some sort. We have already discussed her right to treatment. The question now is, who should pay the $35 per day stipulated by the court order for foster care, and who should provide the other necessities of life for Joyce? Allegheny County takes the position that the Commonwealth should pay all of these expenses. We agree.

With certain exceptions not applicable here, art. V, sec. 507 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. §4507, provides:

". . . the Commonwealth shall pay for the following:

". . .

"(4) Interim care of mentally retarded persons, who have been removed from their homes and who, having been accepted, are awaiting admission to a State facility."

Mr. DeWalt, Joyce's MH/MR caseworker, testified that Joyce had been accepted at Western State School and Hospital and was on its waiting list. Western State School and Hospital is a State "facility" within the definition thereof in article I, sec. 102 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. §4102. Joyce is, therefore, entitled to interim care as provided by the act.

With certain exceptions not applicable here, art. III, sec. 301(d)(8) of the Mental Health and Mental Retardation Act, 50 P.S. §4301(d), provides:

". . . it shall be the duty of local authorities in cooperation with the department to insure that the following mental health and mental retardation services are available:

". . .

"(8) Interim care of mentally retarded persons who have been removed from their homes and who having been accepted, are awaiting admission to a State operated facility."

We find that the "local authorities," who are in this case the Allegheny County Commissioners, through CWS and MH/MR have fulfilled the requirements of this portion of the act by making available to Joyce what we deem to be suitable interim care, namely, the "R.T." foster home.

The Commonwealth has a clear duty, mandated by the Mental Health and Mental Retardation Act of 1966, to provide for citizens with mental disabilities such as those suffered by Joyce Z. It is no answer for the State to advise the court now that it

is incapable of performing such duties and thus be relieved of its responsibilities.

The Allegheny County Commissioners, through CWS and MH/MR, did what was required of them. They have made available suitable interim care for Joyce. Admittedly, it is expensive; it is, nevertheless, not so expensive as placement at an institution such as Western State School and Hospital, and the care Joyce will receive in the R.T. foster home will certainly be far superior to that which can be provided by the hospital.

Counsel for the Department of Public Welfare furnished us with a copy of a memorandum dated February 3, 1970, from Stanley A. Miller, then Secretary of Public Welfare of the Commonwealth, and a copy of a memorandum dated June 7, 1971, from Mrs. Helene Wohlgemuth, then Secretary of Public Welfare of the Commonwealth.

The Miller Memorandum discussed interim care payments and stated that the Mental Health/ Mental Retardation program was *not* responsible for making foster home placements or foster home payments.

The Wohlgemuth Memorandum amended this by stating:

"Child Welfare ha's the basic responsibility of finding and funding foster home placements. The mentally disabled child requires a very specialized type of foster home. Usually, because of the mental disability this specialized foster home care will cost more. *The funding of this additional cost is the responsibility of the Mental Health/Mental Retardation program.*" (Emphasis supplied.)

The interlocutory order which we entered on December 6, 1974, was consistent with the contents of

the Wohlgemuth Memorandum just quoted. We directed CWS to pay the then prevailing $3.75 per diem rate for Joyce and Allegheny County MH/MR Program to pay the difference between that and the total rate of $35 per day directed by the court.

We conclude, however, after close examination of the provisions of the act as discussed above, that our interlocutory order was in error. The Miller and Wohlgemuth Memoranda are internal policy guidelines for the Department of Public Welfare and do not have the force of law. The act is clear. The State must pay.

Joyce was accepted by Western State School and Hospital; the local authorities obtained the interim care for her; now the Commonwealth must pay for that interim care and, in addition, meet all the medical needs brought about by her condition, just as they would if she were residing in Western State School and Hospital.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER

And now, March 31, 1975, after full hearings and careful consideration of the briefs filed in this matter, this court makes the following findings of fact, conclusions of law and final order:

### FACTS

1. Joyce Z. is a profoundly retarded child in need of placement outside her home.

2. No private agency or private institution is known which can provide adequate care for said child.

3. The only public institution which can take said child is Western State School and Hospital, Canonsburg, Pa.

4. Western State School and Hospital is so overcrowded and understaffed that it would be detrimental to said child to commit her there.

5. Said child has been placed in a suitable foster home at a reasonable foster home board rate of $35 per day.

## CONCLUSIONS OF LAW

1. Said child is mentally disabled within the meaning of the Mental Health and Mental Retardation Act of 1966.

2. Said child is still "dependent and neglected" within the meaning of the 1933 Juvenile Court Law of Allegheny County.

3. Said child has a constitutional right to life and a constitutional and statutory right to regenerative treatment for her mental disability.

4. Child Welfare Services of Allegheny County (hereinafter called "CWS") and Allegheny County Mental Health and Mental Retardation Program (hereinafter called "MH/MR") have a joint responsibility to provide casework services for said child, her parents and foster parents.

5. The Commonwealth of Pennsylvania, through the Pennsylvania Department of Public Welfare (hereinafter called the "Department"), has the financial responsibility to meet the physical needs of said child.

## ORDER

1. Said child is committed to the R.T. foster home.

2. CWS and MH/MR shall jointly provide casework services for said child, her parents and foster parents, but may agree between themselves as to what services each agency shall provide so as to avoid duplication of services.

3. The department is directed to pay the entire cost of foster payments to the R.T. foster parents of said child at a rate of $35 per day so long as said child remains in said foster home, said rate to be subject to renegotiation from time to time as the cost of service of Joyce's needs may vary.

4. The department is directed to pay any cost not covered by Medical Assistance or third party carriers for:

a. psychiatric and psychological work, rehabilitative training, sheltered workshop services and any other service needed by Joyce and authorized by the Mental Health and Mental Retardation Act of 1966 and Regulations thereunder;

b. transportation for Joyce to and from the location of such services;

c. those drugs prescribed specifically for a mental disorder;

d. general medical care, prosthetic appliances, special equipment and clothing.

5. The Department shall reimburse CWS and MH/MR for funds they have expended to date for foster home payments pursuant to the order of this court dated December 6, 1974.

6. CWS shall keep current a "white foster care child card" for said child so long as this is permissible according to Federal, State and local law.