Commonwealth ex rel. Finken, Appellant, *v.* Roop.

Argued March 26, 1974. Before WATKINS, P.J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Margaret H. Poswistilo,* Assistant Public Defender, for relator, appellant.

*Renald S. Baratta,* Assistant Solicitor, with him *Andrew L. Herster, Jr.,* Solicitor, and *Malos, Baurkot & Baratta,* and *Alan B. McFall,* Assistant District Attorney, and *Charles H. Spaziani,* District Attorney, for appellee.

OPINION BY HOFFMAN, J., April 22, 1975:

Appellant challenges the constitutionality of §406 of the Pennsylvania Mental Health and Mental Retardation Act of 1966[1] under which he had been committed from November 5, 1973, until May, 1974.[2]

On January 19, 1970, appellant pleaded guilty to charges of sodomy and corrupting the morals of a minor. Pursuant to §4410 of the Mental Health Act,[3] appellant was again committed to Allentown State Hospital for a ninety-day period commencing February 13, 1970. On May 14, 1970, the commitment order was indefinitely extended. Appellant was released from Allentown State Hospital on March 12, 1973. At the time appellant was discharged, Dr. Bischoff, a psychiatrist at the hospital, filed a report concluding that appellant no longer required confinement in a mental institution. Dr. Bischoff's report did state that appellant needed a strong structure with rigid control, but she felt that probation would provide some of that structure. On April 9, 1973, appellant was sentenced to two years' probation on the sodomy and corruption charges. As a condition of his probation, appellant was required to undergo regular treatment.

_____

1. Act of October 20, 1966, P.L. 96, Art. IV, §406, 50 P.S. §4406.

2. Appellant had previously been committed to Allentown State Hospital from July, 1964, until December, 1968.

3. Act of October 20, 1966, supra, §410, 50 P.S. §4410 provides that a person adjudged guilty of a crime may be committed to a mental hospital in lieu of sentence, for a period not to exceed the maximum sentence authorized by law.

Dr. Ovitz, the psychiatrist in charge of the Mental Health Agency in Easton, examined the appellant for one hour on July 9, 1973. Dr. Ovitz concurred in the diagnosis made at Allentown State Hospital that appellant suffered from sexual deviation, homosexuality, schizophrenic reaction of a "chronic undifferentiated type." The trial judge received this report on August 31, 1973, and concluded that appellant was "a dangerous individual and should not be walking the streets." The judge issued a bench warrant and instructed parole officials to take appellant into custody. The Pennsylvania Board of Probation and Parole never requested that appellant's probation be terminated. Nevertheless, appellant was incarcerated as a probation violator in Northampton County Prison on September 10, 1973. A hearing was held on September 19, 1973, and appellant was ordered to remain in confinement until the next hearing.

On October 24, 1973, Thomas Cavanaugh, Warden of Northampton County Prison, filed a petition under §408 of the Mental Health and Retardation Act, supra, which provides for the commitment of persons charged with a crime and detained in a penal or correctional institution. The following day, a hearing was held on a habeas corpus petition filed by appellant. The Parole Board and the District Attorney informed the court that appellant was not guilty of any technical probation violation and therefore could not be detained further. The court granted appellant's petition for habeas corpus, and ordered Northampton County Prison to release the appellant. Appellant's discharge obviously foreclosed continuance of commitment proceedings under §408. The District Attorney, however, moved to amend the petition so that the Commonwealth could proceed under §406, providing for civil commitment. Appellant, therefore, had notice of the petition for one day, but had never received a copy. The Commonwealth then requested that the court hold a hearing to determine whether appellant should be committed

for a period not to exceed ten days during which he would undergo examination and observation. Defense counsel objected to the Commonwealth's motions, alleging inadequate notice, but the court ordered that the hearing proceed, pursuant to §406 (a) (4) (ii), to determine whether appellant should be committed for ten days.

Dr. Ovitz testified and repeated the substance of the report he had prepared on July 9, 1973. Dr. Ovitz had attempted to interview the appellant on October 24, 1973, but was informed that appellant would not cooperate on advice of counsel. Dr. Bischoff also testified and repeated her evaluation of March 12, 1973, when the appellant was discharged from Allentown State Hospital. Dr. Bischoff testified further that appellant belonged in a "Halfway House" and did not require confinement in a mental institution. Following the close of testimony, the court ordered that appellant be sent to Muhlenberg Medical Center. Two physicians were directed to examine the appellant and report their findings and recommendations to the court within ten days.

A civil commitment hearing was held before Judge GRIFO on November 5, 1973, for the purpose of receiving the report of the examining physicians. Appellant's counsel was then given a copy of Warden Cavanaugh's petition for the first time. Defense counsel objected to the hearing on the ground that the initial hearing at which appellant was ordered committed for ten days was void because appellant had not received adequate notice. Counsel also contended that even if appellant had been afforded proper notice of the October 25 and November 5 hearings, appellant was not prepared to proceed because an October 24, 1973, petition requesting the appointment of an independent psychiatric expert was outstanding. President Judge PALMER had not yet acted on appellant's petition because he had to research the legal problems attendant to appellant's request for confidentiality. Appellant's objections were overruled.

Dr. Rowley, who had examined appellant at the Muhlenberg Medical Center, testified that appellant posed a greater danger to himself than he did to the community at large. Following Dr. Rowley's testimony, Judge GRIFO ordered appellant committed to Allentown State Hospital for a period of six months. Immediately thereafter, the court denied a habeas corpus petition which appellant had filed on October 30, 1973. This appeal was taken from the denial of that petition.[4]

Appellant contends that the Commonwealth failed to comply with the terms of the Pennsylvania Civil Commitment Statute, 50 P.S. §4406,[5] and thus unlawfully com-

---

4. Although appellant is no longer committed to Allentown State Hospital, he was released on the condition that he receive outpatient treatment at the Easton Mental Health Agency. Thus, appellant's arguments cannot be dismissed as "moot." Furthermore, even if appellant's civil commitment were completely terminated, the mootness doctrine would not apply: (1) the appeal is the subject of a continuing controversy; (2) the constitutional issues raised are extremely important and affect a large number of persons; and (3) the collateral consequences and stigma of being adjudged mentally ill remain to plague appellant throughout his life. *In Re John Ballay*, 482 F. 2d 648 (D.C. Cir. 1973).

5. §406 of the Mental Health Act provides as follows: "(a) Whenever a person is *believed to be mentally disabled, and in need of care or treatment by reason of such mental disability,* and examination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis.

(1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis or by the executive officer or an authorized agent of a governmental or recognized nonprofit health and welfare organization or agency or any responsible person.

(2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician.

mitted appellant to Allentown State Hospital. Appellant also argues that the statute fails to provide the procedural and substantive due process required by the Fourteenth Amendment. In recent years, the courts of this Commonwealth, the federal courts, and the commentators, have given increasing attention to the problem of defining what process must constitutionally be afforded to persons not strictly criminal defendants: juveniles, persons convicted under habitual sexual offender or sexual psychopath statutes, persons mentally incompetent to stand criminal trial, persons acquitted of criminal charges by reason of insanity, defective delinquents, and persons civilly committed. The thrust of judicial development in this area has been the recognition that commitment involves a major curtailment of individual liberty. Therefore, a statute authorizing such an involuntary infringement of a basic personal right is subject to and regulated by the Due Process Clause of the Fourteenth Amendment. In the present case, we must first determine

---

(3)  Said court upon consideration of such petition shall: (i) issue a warrant requiring that such person be brought before said court; (ii) fix a date for a hearing which shall be as soon as the warrant is executed, and (iii) notify the parties in interest.

(4)  After hearing, said court may: (i) order an immediate examination by two physicians appointed by said court, or (ii) order the commitment of the person believed to be mentally disabled, to a facility for a period not exceeding ten days for the purpose of examination. If the examination can be accomplished by partial hospitalization said court may so direct.

(b)  If, upon examination, it is determined that such person *is in need of care* at a facility, the examining physicians or director, as the case may be, shall immediately report to said court, which may order the commitment of such person for care and treatment.

In its order of commitment, said court may permit partial hospitalization or outpatient care, or if at any time thereafter the director shall determine such partial hospitalization or outpatient care to be beneficial to the person so committed, the same may be permitted by said court upon application by the director." (Emphasis added.)

whether the Commonwealth complied with §406 in committing appellant. We then must decide the broader questions presented: whether §406 of the Mental Health and Retardation Act provides an individual the procedural and substantive due process required by the Fourteenth Amendment.

## I. *Alleged Failure to Comply with §406*

### A. *Inadequacy of the Petition*

Under §406 (a), a petition for civil commitment may be filed "[w]henever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability." Section 406 (a) (1) provides that the petition may be made by "an authorized agent of a governmental . . . agency." Section 406 (a) (2) requires that "[t]he petition shall *set forth the facts upon which the petitioner bases his belief of mental disability* and the efforts made to secure examination of the person by a physician." (Emphasis added). The petition filed in the present case is inadequate.

Warden Cavanaugh is clearly a proper party to file a commitment petition. The petition, however, avers no facts to explain why the petitioner believed appellant to be mentally disabled, and thus fails to comply with §406 (a) (2). It is true that the petition was originally filed under §408, providing for the commitment of persons charged with a crime and detained in a penal or correctional institution. It is also true that §408 does not require the petitioner to set forth the facts upon which he bases his belief that the person is mentally disabled. The appellant, however, vigorously objected when the Commonwealth asked for leave to amend the petition into a civil commitment petition under §406. The trial court granted the motion and proceeded to hold the preliminary hearing to determine whether appellant should be confined for a ten-day period to undergo examination. Warden Cavanaugh's petition was treated as a civil commit-

ment petition throughout the entire course of the proceedings in the court below. The trial judge should have made certain that the petition was adequate under §406 before it granted the amendment. Appellant did not specifically object on this ground to the Commonwealth's request for amendment. Because appellant was not given a copy of the petition until the actual commitment hearing, held ten days later on November 5, 1973, he cannot be deemed to have waived this argument. Therefore, even assuming that §406 is constitutional in all respects, appellant's commitment was erroneous for failure to comply with the statutory directive.

B. *Inadequate Notice*

Section 406(a).(3) provides that when a petition is filed, the court must: (1) issue a warrant requiring that the person be brought before the court; (2) fix a date for a hearing, which shall be as soon as the warrant is executed; and (3) notify the parties in interest. In the present case, the authorities had previously incarcerated appellant as a probation violator, thus obviating any need to issue a warrant. The petition was filed on October 24, 1973, and the hearing was held on October 25, immediately after the court ordered appellant released from Northampton County Prison. Thus, at best, appellant had notice of the §408 petition for one day. Appellant was not informed that the petition would be under §406 until the day of the hearing.

It is clear that appellant is a "part[y] in interest." Under the terms of the statute, therefore, the court was required to notify him that a civil commitment petition had been filed against him. It is well-settled that every presumption is in favor of the constitutionality of legislative acts, *Glancey v. Casey,* 447 Pa. 77, 88, 288 A. 2d 812 (1972), and that statutes should be construed whenever possible to uphold their constitutionality. *Bentman v. Seventh Ward Democratic Executive Committee,* 421 Pa. 188, 218 A. 2d 261 (1966). Thus, we must construe

§406 (a) (3) (iii)  with these established principles in mind: we must assume that the state legislature did not intend to violate either the federal or Commonwealth constitution.

In requiring that all parties in interest be given notice of the petition, the legislature must have intended that the notice be adequate and in compliance with the dictates of the Due Process Clause. "Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded . . ." *Application of Gault*, 387 U.S. 1, 33 (1967). In *Lessard v. Schmidt*, 349 F. Supp. 1078 (E.D. Wis. 1972), vacated and remanded for more specific injunction sub. nom. *Schmidt v. Lessard*, 414 U.S. 473, 94 S. Ct. 713 (1974), a case dealing with civil commitment, the court amplified the essentials of adequate notice: "Notice of date, time and place is not satisfactory. The patient should be informed of the basis for his detention, his right to jury trial, the standard upon which he may be detained, the names of examining physicians and all other persons who may testify in favor of his continued detention, and the substance of their proposed testimony." 349 F. Supp. at 1092. Although we do not adopt all the elements required by *Lessard,* it is clear that the appellant was not provided adequate notice. In addition to the facts that notice of the hearing was given only one day in advance, appellant was never informed of the reasons for his detention prior to the preliminary hearing of October 25. Futhermore, appellant was not made aware of the substance of Dr. Rowley's testimony until he actually testified at the final commitment hearing. Finally, the petitioner, Warden Cavanaugh, did not appear at either hearing, thus depriving the appellant of an opportunity to cross-examine his principal accuser.

It should be noted that the failure of §406 to specify basic procedural safeguards does not render the statute

unconstitutional on its face. By reasonable construction, these due process dictates can be incorporated into the statute. For example, §406 does not require that the subject of a civil commitment petition be represented by counsel. Nor does it require that the final commitment order follow an evidentiary hearing. If neither were read into the statute, §406 would be blatantly unconstitutional. Appellant makes neither of these claims because he was ably represented by counsel throughout the entire course of the commitment procedure, and he was afforded an evidentiary hearing before the lower court issued the final commitment order. Similarly, the notice requirement contained in §406(a)(3)(iii) must be construed to require that the subject of a commitment proceeding be given a copy of the petition in advance of the hearing, and that the names of all adverse witnesses and the substance of their testimony be provided sufficiently in advance of the hearing. Both are essential if the subject of the petition is to be given an opportunity to prepare a meaningful defense.[6] In addition, the petitioner must

6. In *Dixon v. Attorney General of the Commonwealth of Pennsylvania*, 325 F.Supp. 966 (M.D. Pa. 1971), a case involving an attack on the constitutionality of §404 of the Mental Health Act of 1966, the court held the provision unconstitutional on its face. Section 404, however, provides for commitment upon application to the director of a state facility—there is no court proceeding. Under §404, the director of a facility may commit an individual on the basis of certificates of two examining physicians.

The court's order approving the relief consented to by the parties, enumerated principles that must be followed in involuntary commitments. The similarity between appellant's contentions and the procedural safeguards ordered by the District Court are apparent:

"1) The subject thereof shall be informed of his right to counsel and an attorney shall be appointed to represent him unless he can afford to retain an attorney himself.

"2) The subject thereof shall be entitled to independent expert examination and assistance in preparation for the hearing, through court appointment where the subject cannot afford to

appear at the hearing, if available, to comply with the confrontation clause of the Sixth Amendment.[7]

## II. *Necessity for Stringent Due Process Requirements in Commitment*

It is obvious that involuntary commitment involves the same fundamental liberty that is at stake in criminal

---

retain these services. Communications between the subject and the expert described herein shall be privileged.

"3) The subject thereof shall be entitled to a full hearing at which he shall have the right to present evidence in his own behalf, to subpoena witnesses and documents, and to confront and cross-examine all witnesses against him . . . .

"6) There shall be a verbatim transcript and full record made of the commitment proceedings, and any member of the class committed pursuant to these proceedings shall have the right to state appellate court review, including provision for assistance of counsel and record and transcript without cost if he is unable to pay the cost thereof. Any person committed will be advised of his rights with respect to appeal by the court at the time of commitment."

7. Appellant also contends that the Commonwealth failed to comply with §406 in that only one physician testified at the commitment hearing. Appellant's argument misreads the statute. The court below committed appellant for a ten-day period for the purpose of examination, in accordance with §406(a)(4)(ii). Under §406(b), the examining physicians or director, as the case may be, must immediately report to the court if, upon examination, it is determined that the individual is in need of care. After receiving such report, the court may order that the person be committed. There is no requirement in the statute for an evidentiary hearing when commitment is ordered. The statute requires a hearing only for the preliminary purpose of determining whether the individual should undergo further examination. The court may issue a commitment order on the basis of the reports of the examining physicians or director. Thus, there was no statutory requirement that the trial court hear the testimony of Dr. Rowley in open court. The trial judge did receive reports from two physicians who had examined appellant during the ten days in which he was confined at Muhlenberg Medical Center. Thus, the court's commitment order was in compliance with the statute in this regard.

proceedings: the right of every individual to be unimpeded in the conduct of his affairs:[8] "An individual who is confronted with the possibility of commitment . . . runs the risk of losing his most important right—his liberty." *Murel v. Baltimore City Criminal Court,* 407 U.S. 355, 364-365 (1972) (DOUGLAS, J., dissenting). Indeed, Judge WISDOM has recently indicated that the consequences of involuntary commitment upon the individual may be even more severe than the consequences of criminal confinement: "Civil commitment involves stigmatizing the affected individuals, and the stigma attached, though in theory less severe than the stigma attached to criminal conviction, may in reality be as severe, or more so." *Donaldson v. O'Connor,* 493 F. 2d 507, 520 (5th Cir. 1974). The immense individual interests involved in civil commitment lead inexorably to analogy with the criminal justice system. The power of the state to incarcerate those convicted of crimes has been tempered with strict procedural safeguards designed to protect the rights of the accused. Yet state commitment procedures have not traditionally assured similar due process safeguards against an unjustified deprivation of liberty. *Lessard v. Schmidt,* supra, at 1084.

In the past, courts have held that commitment proceedings did not require the full panoply of due process safeguards that are accorded those accused of crime. Usually, the justification asserted was that the state, al-

---

8. The number of people in mental hospitals is not always recognized: "In 1966 there were approximately 580,000 resident patients in public and private mental hospitals and an additional 557,000 receiving care through outpatient clinics. Nearly 922,000 were admitted to the inpatient clinics and nearly 630,000 to the outpatient, a substantial majority of which were involuntary. This approximates if not exceeds the number of criminals sentenced and institutionalized in the United States during the same period." *In Re John Ballay,* supra, at 654, citing American Bar Foundation, the Mentally Disabled and the Law XV. (S. Brakel & R. Rock ed. 1971).

though depriving a person of his liberty, was acting not to punish, but to treat and to rehabilitate. This rationale was emphatically rejected by the Supreme Court in *Gault*, in discussing the due process requirements for juvenile proceedings: ". . . The child—essentially good, as [the early reformers] saw it—was to be made 'to feel that he is the object of [the state's] care and solicitude,' not that he was under arrest or on trial. . . . The apparent rigidities, technicalities, and harshness which they observed in both substantive and procedural criminal law were therefore to be discarded. The idea of crime and punishment was to be abandoned. The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive.

"These results were to be achieved, without coming to conceptual and constitutional grief, by insisting that the proceedings were not adversary, but that the state was proceeding as *parens patriae*. The Latin phrase proved to be a great help to those who sought to rationalize the exclusion of juveniles from the constitutional scheme; but its meaning is murky and its historic credentials are of dubious relevance. . . .[9]

"Accordingly, the highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is—to say the least—debatable . . ." 387 U.S. at 15-17 (footnotes omitted).

Although *Gault* focused on the procedural due process that must be accorded juveniles, its reasoning must apply to civil commitment because in both situations individual liberty and the freedom from unwanted restraint are at stake. See, e.g., *Heryford v. Parker*, 396 F. 2d 393, 396

---

9. For a discussion of the origins and nature of the *parens patriae* power, see *Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv. L. Rev. 1190, 1207-1222 (1974).

(10th Cir. 1968) ; *Commonwealth ex rel. McGurrin v. Shovlin,* 435 Pa. 474, 257 A. 2d 902 (1969) (ROBERTS, J., concurring).

A second justification that has been asserted in support of lowering due process standards in commitment proceedings is the proposition that involuntary commitment is civil, rather than criminal in nature. Thus, as recently as nineteen years ago, the Pennsylvania Supreme Court stated that a commitment proceeding "is not a criminal prosecution but a collateral proceeding to determine the mental health of the person involved for his benefit or for the benefit of the public or both." *Commonwealth v. Bechtel,* 384 Pa. 184, 190, 120 A. 2d 295, 298 (1956). This rationale is actually only another formulation of the *parens patriae* argument and is impossible to support after *Gault.* Euphemistic terminology is not determinative of the application of the Due Process Clause: "We cannot, nor should we, ignore the serious consequences of such proceedings simply by designating them as 'collateral' rather than 'criminal'. . . . Whether denominated collateral or criminal, such proceedings are surely subject to the due process clause of the Constitution." *Commonwealth ex rel. McGurrin v. Shovlin,* 210 Pa. Superior Ct. 295, 300, 231 A. 2d 760 (1967) (HOFFMAN, J., dissenting), rev'd 435 Pa. 474, 257 A. 2d 902 (1969). Furthermore, in *Commonwealth v. Dooley,* 209 Pa. Superior Ct. 519, 232 A. 2d 45 (1967),[10] this Court stated that "[t]hese commitment proceedings whether denominated civil or criminal are subject both to the Equal Protection Clause of the Fourteenth Amendment as we held in Baxstrom v. Herold, 383 U.S. 107, . . . and to the Due Process Clause." 209 Pa. Superior Ct. at 525,

10. *Commonwealth v. Dooley* held that the Barr-Walker Act, Act of January 8, 1952, P.L. (1951) 1851, former 19 P.S. §§1161-1174, which provided that persons convicted of certain sex offenses could be sentenced to an indeterminate term of imprisonment, was unconstitutional.

232 A. 2d at 48, quoting *Specht v. Patterson,* 386 U.S. 605 (1967).

We must consider the reality of the lower court's commitment order. The serious deprivation of liberty and the unfortunate stigma which follow involuntary commitment render the distinction between "criminal" and "civil" proceedings meaningless. The reasoning in *Gault* is controlling: "A boy is charged with misconduct. The boy is committed to an institution where he may be restrained of liberty for years. *It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School.* The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes 'a building with whitewashed walls, regimented routines and institutional hours . . .' " 387 U.S. at 27. (footnote omitted, emphasis added). *See also, In Re Winship,* 397 U.S. 358, 365-366 (1970) ; *Lessard v. Schmidt,* supra, at 1088.[11]

Although the states "have traditionally exercised broad power to commit persons found to be mentally ill,"

---

11. Several courts have recently held that civil commitment carries with it a constitutional right to treatment: ". . . a person involuntarily civilly committed to a state mental hospital has a constitutional right to receive such *individual treatment* as will give him a reasonable opportunity to be cured or to improve his mental condition." *Donaldson v. O'Connor,* supra, at 520. (Emphasis added). *See also Rouse v. Cameron,* 373 F. 2d 451 (D.C. Cir. 1966) ; *Welsch v. Likins,* 373 F. Supp. 487 (D. Minn. 1974) ; *Stachulak v. Coughlin,* 364 F. Supp. 686 (N.D. Ill. 1973).

A right to treatment, however, cannot be used to justify a relaxation of procedural safeguards. As stated in *Lessard v. Schmidt,* supra, at 1087, this argument "ignores the fact that unless constitutionally prescribed procedural due process requirements for involuntary commitment are met, no person should be subjected to 'treatment' against his will. The argument also ignores the fact that many mental illnesses are untreatable."

*Jackson v. Indiana,* 406 U.S. 715, 736, 92 S. Ct. 1845, 1857 (1972), and continue to do so, that power must now be exercised only in accordance with the constitutional mandate of due process.

### III. *Denial of Procedural Due Process*

A. *Exclusion of Hearsay*

At the initial hearing on October 25, Dr. Ovitz was asked on cross-examination:

"Q. Doctor, on what basis are you saying at the present time that he's dangerous, to commit him for an examination?

"A. On the basis of the past history of compulsive sexual deviation, refusal to follow rules in jail, *I understand,* and ..." (Emphasis added).

Appellant's objection to the admission of the last statement was overruled by the trial judge. There was no indication that Dr. Ovitz had any personal knowledge of the appellant's failure to observe prison rules. On the contrary, Dr. Ovitz's testimony indicates that he was relying, in part, on the declaration of others to reach his conclusion that appellant ought to be committed for ten days for purposes of examination.

The Commonwealth advances no argument to support a relaxation of the customary rules of evidence in involuntary commitment proceedings. In *Lessard v. Schmidt,* supra, the court stated: "Where standard exclusionary rules forbid the admission of evidence, no sound policy reasons exist for admitting such evidence in an involuntary mental commitment hearing. Indeed, ... the seriousness of the deprivation of liberty and the consequences which follow an adjudication of mental illness make imperative strict adherence to the rules of evidence generally applicable to other proceedings in which an individual's liberty is in jeopardy." 394 F. Supp. at 1103. It places no burden on the Commonwealth to ensure that the examining physicians are furnished with admissible

reports compiled on the subject at institutions in which he had been previously confined. The rationale behind the exclusion of hearsay is the inherent unreliability of such evidence. It would be strange indeed to deprive one of his liberty on the basis of evidence that would be inadmissible in a proceeding to determine negligence. The individual interest at stake compels the conclusion that the exclusion of hearsay testimony is "fundamental" to the subject's receiving a fair trial. Cf. *Jones Appeal*, 449 Pa. 543, 297 A.2d 117 (1972); *Terry Appeal*, 438 Pa. 339, 265 A.2d 350 (1970).[12] *See also, Note, Juvenile Delinquents: the Police, State Courts, and Individualized Justice*, 79 Harv. L. Rev. 775, 795 (1966) : "But to the extent that the rules of evidence are not merely technical or historical, but like the hearsay rule have a sound basis in human experience, they should not be rejected in any judicial inquiry."

### B. *Burden of Proof*

Justice HARLAN, concurring in *In Re Winship*, 397 U.S. 358 (1970), stated that ". . . the choice of the standard for a particular variety of adjudication does, I think, reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations." 397 U.S. at 370. Thus, in *Woodby v. Immigration and Naturalization Service*, 385 U.S. 276 (1966), the Court, in determining the burden of proof for deportation, stated that ". . . a deportation proceeding is not a criminal prosecution. . . . But it does not syllogistically follow that a person may be banished from this country upon no higher degree of proof than applies in a negligence case. . . . We hold that no deportation order may be entered

---

12. In view of the Commonwealth's failure to comply with the mandates of §406, and the unconstitutionality of the statute, see discussion, Section IV, infra, it is not necessary to decide whether the inadmissible hearsay admitted at the preliminary hearing would amount to reversible error.

unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true." 385 U.S. at 285-286. It would seem that the social costs of an erroneous factual determination are greater in civil commitment than in deportation. In any event, it is clear that a mere preponderance of the evidence standard provides too large a margin of error for such a severe infringement of individual liberty.

*In Re John Ballay,* supra, discussed this issue in terms of striking a proper balance between the state interest in civilly committing persons who pose a danger to society or themselves, and the individual interest in remaining free from unwanted restraint. The Court adopted a reasonable doubt standard because "a more demanding burden of proof is by its nature largely neutral in its affect on relevant state policies. It is more appropriately characterized as a particularly suitable means of reducing the risk of factual errors which may be engendered by the statute or by the difficulties inherent in the disciplines associated with mental illness." 482 F. 2d at 650. The court in *Lessard v. Schmidt,* supra, also adopted a reasonable doubt standard.

It is impossible to discern the standard used by the court below. Appellant vigorously argues that the evidence was insufficient to commit under any burden greater than preponderance. This contention need not be reached because appellant's commitment must be vacated for other reasons already discussed. It seems clear, however, that any burden of proof less than "clear, unequivocal and convincing" would not pass constitutional muster.

C. *Failure to Require Examining Physicians to Warn the Subject that He has a Right to Remain Silent.*

Appellant's contention poses a very serious and difficult issue. Clearly, the privilege against self-incrimination will be applicable to commitment proceedings, and the subject cannot be compelled against his will to divulge

matters which will then be used as a basis for commitment.[13] Subjects of commitment petitions will be represented and will be free, as is true of the instant case, to follow the advice of counsel and not cooperate with the examining physicians. Appellant argues, however, that a "Miranda"-type warning is required before any examination can proceed.

At the outset, it is clear that statements made by an individual to a psychiatrist employed by the state are within the Fifth Amendment privilege against self-incrimination. In *Commonwealth v. Pomponi*, 447 Pa. 154, 284 A. 2d 708 (1971), our Supreme Court rejected the Commonwealth's argument that statements made to psychiatrists appointed by the court to examine a defendant who entered a plea of insanity were "physical" rather than "testimonial" in nature. Statements made by an individual concerning his personal history are distinguishable from voice identification held permissible in *United States v. Wade*, 388 U.S. 218 (1967). Statements concerning one's mental state may be inculpatory in this context, because the commitment decision will be based in large part on the court's evaluation of the individual's likelihood to perpetrate acts in the future that will be harmful to society or to himself.

It is appealing to continue the analogy with the criminal justice system and require that the psychiatrist warn the subject of his right to remain silent. The Commonwealth, on the other hand, might contend that a warning would unduly interfere with the diagnostic process. In view of the fact that counsel is required, and that the subject must be accorded a fair and accurate proceeding, it would seem that the individual's interests

---

13. There is nothing in §406 which compels cooperation—there are no penalties for failure to answer questions. This is not true of all state statutes, some of which provide contempt as a sanction. See Lindman and McIntyre, *The Mentally Disabled and the Law*, University of Chicago Press, 1961, pp. 308-309.

are sufficiently protected. It must be noted that not *all* due process requirements are automatically applicable to proceedings that are not criminal prosecutions. See *McKeiver v. Pennsylvania,* 403 U.S. 528 (1971). This opinion has stressed the need for basic due process, but recognizes that commitment, while closely related to criminal prosecutions, is not identical.[14]

D. *Failure to Allow Facility to Adopt Less Restrictive Course Without Prior Judicial Approval*

Section 406 (b) provides in part: "In its order of commitment, said court may permit partial hospitalization or outpatient care, or if at any time thereafter the director shall determine such partial hospitalization or outpatient care to be beneficial to the person so committed, the same *may be permitted by said court* upon application by the director." (Emphasis added). In *Dixon v. Attorney General,* supra, at p. 974, the court

---

14. If a "Miranda" warning were required, presumably the individual would be free to waive his right to remain silent and freely speak with the psychiatrist. This might pose great conceptual difficulties. Under the Act, a petition can be made under §406 if the petitioner believes that the person is "mentally disabled." "Mentally disabled" is defined under §102 of the Act as ". . . any mental illness, mental impairment, mental retardation, or mental deficiency, which so lessens the capacity of a person to use his customary self-control, *judgment and discretion* in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care as provided in this act." (Emphasis added).

It is well-settled that a waiver, to be effective, must be knowing, intelligent, and voluntary. *Johnson v. Zerbst,* 304 U.S. 458 (1938). If the Commonwealth accepts the subject's waiver, and proceeds to use the information he divulges to the psychiatrist at the commitment hearing, how could the Commonwealth possibly sustain its burden of proof on the issue of the subject's mental disability? If a person is capable of knowingly and intelligently waiving a fundamental right, can it be said that he suffers from a mental disability, which lessens his "capacity . . . to use his customary self-control, judgment and discretion . . ."?

order stated in part: "The court order shall permit the facility having charge of the committed person to take whatever action toward greater liberty that appears to it to be in such person's best interest without obtaining court approval, . . ." It does not seem, however, that this rises to a deprivation of due process. If we accept the initial judgment that the judicial system is equipped to deal with the complex problem of the relationship of the mentally ill to society, there seems to be no constitutional mandate requiring that final decisions be made outside the judicial system.

E. *Failure to Inform Subject of Alternatives to Commitment and the Basis for Rejecting the Alternatives*

This issue is brought precisely into focus by the facts of the present case. At the preliminary hearing, Dr. Bischoff testified that appellant did not require confinement in a mental institution. At the commitment hearing, Dr. Rowley stated that in his opinion appellant posed a greater danger to himself than he did to society. Thus, the court was fully aware of the possibility that both the societal and individual interests at stake could be satisfied by some form of custody less drastic than complete and total commitment to a mental institution. Yet, the court made no effort to investigate any alternative, other than to inform Dr. Bischoff that the county did not have a "Halfway House."

In view of the vigorous attacks leveled against the commitment of mentally ill persons in general,[15] it would seem incumbent upon the counties, or if they are unable, upon the Commonwealth, to provide alternatives to commitment for those individuals who are not in need of total confinement. Thus, in *Dixon v. Attorney General,* supra, at p. 974, the court ordered that "[n]o commitment shall authorize confinement at Farview State Hospital absent a specific finding based on a preponderance

---

15. See discussion, Section IV, infra.

of the evidence that placement at Farview State Hospital is necessary. To support such a finding the Commonwealth shall have the burden of proving that there is no facility or part of a facility where the subject of the hearing can be committed.[16] See also *Lessard v. Schmidt, supra,* at 1096;[17] *Note, Civil Commitment of the Mentally Ill, Theories and Procedures,* 79 Harv. L. Rev. 1288, 1298 (1966).

### IV. *Denial of Substantive Due Process*

Appellant contends that §406 is unconstitutional in that it fails to set forth adequate standards for commitment. Before a court can issue a commitment order, it must be satisfied that the person is "in need of care." Before the petition can be brought, the petitioner must believe that the subject is "mentally disabled," as defined in §102. See, note 14, supra. Thus, in Pennsylvania, a person can be confined against his will if the court believes that he suffers from a mental illness which lessens his capacity to exercise ordinary self-control, judgment and discretion, and if the court also believes that as a result of his mental illness, the individual is "in need of

---

16. The preponderance of the evidence standard was adopted by the court only for the purpose of determining whether the individual should be committed to Farview rather than some other institution. In order for the court to issue a commitment order in the first place, the reliable evidence "must establish clearly, unequivocally and convincingly that the subject of the hearing requires commitment."

17. "We believe that the person recommending full-time involuntary hospitalization must bear the burden of proving (1) what alternatives are available; (2) what alternatives were investigated; and (3) why the investigated alternatives were not deemed suitable. These alternatives include voluntary or court-ordered out-patient treatment, day treatment in a hospital, night treatment in a hospital, placement in the custody of a friend or relative, placement in a nursing home, referral to a community mental health clinic, and home health aide services."

care."[18] It is appellant's position that §406 is impermissibly vague, a contention that has been largely ignored in the past.[19]

"The Supreme Court has identified two principal deficiencies which may result in the invalidation of a statute as impermissibly vague: (1) failure to give fair warning of the conduct proscribed by the law and (2) absence of standards restricting the discretion of governmental authorities or courts in enforcing the law." *Developments in the Law—Civil Commitment of the Mentally Ill,* supra, at 1253-1254. If the standards in §406 fail to give adequate warning of conduct which can result in commitment and fail to circumscribe the discretion of the trial court, the statute must be held unconstitutional. See, e.g., *Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972); *Giaccio v. Pennsylvania,* 382 U.S. 399 (1966).

We must start with the proposition that mental health is a proper subject for state regulation, and that a commitment procedure with appropriate safeguards is a valid means for achieving the governmental objectives. We must also, however, be cognizant of the fact that a lack of standards may result in the commitment of in-

18. Fourteen other states also allow the commitment of persons whose mental illness renders them in need of care. The federal Hospitalization of the Mentally Ill Act, 78 Stat. 944 (1964), 21 D.C. Code §§501-597 (1967), requires findings of both mental illness and dangerousness. See *Bolton v. Harris,* 395 F. 2d 642 (D.C. Cir. 1968).

19. In reference to state commitment statutes, the Supreme Court noted: "Considering the number of persons affected, it is perhaps remarkable that the substantive constitutional limitations on this power have not been more frequently litigated." *Jackson v. Indiana,* 406 U.S. 715, 737, 92 S. Ct. 1845, 1857-1858 (1972). Similarly, the court in *In Re Ballay,* supra, noted that "it may not be totally inaccurate to observe that the recent surge of interest in civil commitment may occasionally focus on procedure to the ultimate detriment of substance." 482 F. 2d at 654 (footnote omitted).

dividuals who would otherwise retain their freedom. Whether §406 provides sufficient standards must be decided in the context of balancing the competing interests of the state and the individual. See *Developments in the Law*, supra.

The first finding necessary in order to commit under §406 is that the subject be mentally ill. This is defined in §102 as the inability to exercise customary self-control, judgment and discretion in the conduct of his affairs and social relations to such an extent as to make it necessary or advisable for him to be under care. The requirement that the subject be "in need of care" is repeated in §406. Mental illness has been attacked as a criterion for commitment because it is usually defined in terms of deviation from the "norm" and thus is dependent upon what the examining psychiatrist believes the "norm" to be.[20] If, however, the term "mental ill-

20. The following excerpt is indicative of this position:

"The common distinguishing factor in civil commitment is aberrance. Before we commit a person we demand either that he act or think differently than we believe he should. Whether our label be inebriate, addict, psychopath, delinquent, or mentally diseased, the core concept is deviation from norms. Our frequently expressed value of individual autonomy, however, renders us unable to express those norms, however deeply they may be felt, in criminal proscriptions. We could not bring ourselves to outlaw senility, or manic behavior, or strange desires. Not only would this violate the common feeling that one is not a criminal if he is powerless to avoid the crime, but it might also reach conduct that most of us feel we have a right to engage in. . . .

"What we are not willing to legislate, however, we have been willing to practice through the commitment process. That process has been used to reach two classes of persons, those who are mentally ill and dangerous to themselves or others, and those who are mentally ill and in need of care, custody or treatment. While those terms seem reasonably clear, on analysis that clarity evaporates. . . . One need only glance at the diagnostic manual of the American Psychiatric Association to learn what an elastic concept mental illness is. . . . Obviously, the definition of mental illness is left largely to the user and is dependent upon the norms

ness" is given sufficient legal meaning so as not to be unconstitutionally vague, see *Developments in the Law,* supra, the difference of opinion among psychiatrists as to what constitutes the "norm" becomes much less important. Thus, if the statute has only a vague standard, the trier of fact must rely almost totally on the expert opinions. The following statement of the court during the commitment hearing is indicative of the difficulties a trial judge acting under §406 faces: "Here is what he did as far as I am concerned. I had a report from a doctor that said he was dangerous and that he might attack a young man and for that reason I took him off the streets. Now, if there is a doctor here that will tell me he will not, maybe he will go right back on the streets, as far as I am concerned, or maybe he will go to some institution that can treat him."

The commitment procedure under §406 has asked too much of psychiatrists. The psychiatrist is not merely asked to report his diagnosis and evaluation to the court, he is asked to draw legal conclusions—is the subject mentally ill and does he need confinement? These conclusions have severe legal consequences and should be answered by the judicial system. That can be accomplished by requiring a strict burden of proof, and by defining "mental illness" in a manner which prevents the court from exercising unfettered discretion (i.e., blindly relying on the conclusion drawn by the examining psychiatrist) and which indicates the type of conduct for which commitment is an appropriate sanction. If the standards are sufficiently precise, confinement will be less dependent upon the examining psychiatrist's personal conception of normal social behavior.

The narrow issue presented by appellant's vagueness argument, therefore, is whether the requirement that the

of adjustment that he employs." Livermore, Malmquist, and Meehl, *On the Justifications for Civil Commitment,* 117 U.Pa.L.Rev. 75, 78-80 (1968) (footnotes omitted).

subject's mental illness render him "in need of care" is sufficient to withstand a constitutional attack of impermissible vagueness. Clearly it is not. "In need of care" is so broad as to be virtually meaningless. Furthermore, once a finding of mental illness is made, it would be impossible not to find that the individual is in need of care.

The federal statute and the statutes of other states require a finding of "dangerousness" in addition to mental illness. Although not found in §406, the lower court apparently used "dangerousness" as the standard. The word "dangerous," however, obviously involves elements of prediction. The person should be committed only if he is mentally ill and if he is likely to commit acts which threaten himself or society. In order for the "dangerousness" standard to be constitutional, there must be appropriate safeguards instituted.[21] At the least, the legislature must formulate a rigorous test for potential dangerousness. "The statute should make it clear that persons are to be committed only if the likelihood is substantial that they will commit dangerous acts." Note, *Civil Commitment of the Mentally Ill: Theories and Procedures,* 79 Harv. L. Rev. 1288, 1291 (1966). In light of the difficulty of predicting that a given mental state is likely to result in future antisocial conduct, it seems necessary to require the commission of some overt act. When coupled with psychiatric evaluation, the court will then be in a better position to assess the likelihood of the individual committing similar acts. The court should not

---

21. "Assuming that dangerousness can be defined, the problem of predictability remains. For the man who can find sexual release only in setting fires, one may confidently predict that dangerous acts will occur. For the typically mentally aberrant individual, though, the matter of prediction is not susceptible of answer. However nervous a full-blown paranoiac may make us, there are no actuarial data indicating that he is more likely to commit crime than any normal person." Livermore, Malmquist, and Meehl, *On the Justifications for Civil Commitment,* 117 U.Pa.L. Rev. 75, 82 (1968).

order commitment unless it is convinced that the probability of such acts occurring is substantial.[22] In any event, §406 as presently written, fails to provide any guidance for either the subject or the court, and therefore must be declared unconstitutionally vague.

The order of commitment is reversed and appellant discharged.

22. An act to amend the Mental Health and Mental Retardation Act of 1966 was introduced during the 1973 session of the General Assembly of Pennsylvania under Senate Bill No. 170. Although this bill did not get out of committee, it is interesting to note the difference between its substantive provisions and those of §406.

To replace the requirement of "mental illness," Senate Bill No. 170 creates two categories of mentally ill individuals: (a) " 'Dangerously disabled person' means a person who is severely mentally disabled . . . by reason of having committed an act or acts constituting a violent assault upon another person and having been acquitted by reason of insanity on a charge based on such act or acts; or . . . having been charged with such act or acts and having been found incompetent to stand trial." (b) " 'Severe mental disability' means a condition resulting from mental illness in which the capacity of a person to exercise self-control, judgment, and discretion in the conduct of his affairs and social relations, or to care for his own personal needs, is so lessened that (1) he poses a clear and present danger of substantial bodily harm to himself or others, or (2) his physical or mental health is seriously threatened. A person shall pose a clear and present danger to himself only if within thirty days prior to his being examined under the provisions of this act or to the filing of a petition for involuntary treatment he has threatened or attempted suicide and he continues to evidence suicidal intent. A person shall pose a clear and present danger to others only if within thirty days prior to being examined under the provisions of this act or to the filing of a petition for involuntary treatment he has (I) inflicted or attempted to inflict substantial bodily harm on another, or (II) has been found incompetent to be tried or has been acquitted by reason of insanity on charges arising from such conduct and he continues to pose a clear and present danger to others by reason of his condition. . . ."

The court can order commitment only "[u]pon a finding of

CONCURRING OPINION BY CERCONE, J.:

While I join in Part I of Judge HOFFMAN'S opinion, I am unable to agree that we should go on to treat the question of the constitutionality of the act. The traditional policy of American courts has been to avoid the decision of constitutional issues when the case at bar may be similarly resolved on other grounds. See, generally, 16 Am. Jur. 2d, Constitutional Law §111 (1964). Furthermore, as footnote 22 of Judge HOFFMAN'S opinion indicates, the legislature currently has before it a bill which, on its face, appears to cure the defect which at least three of my brethren consider to be a denial of due process. Combined with the fact that striking down the instant law would cast doubt on the propriety of the incarceration of many mentally ill persons whose freedom would jeopardize their own safety as well as the safety of others, our resting the decision in the instant case on constitutional grounds would be singularly inappropriate.

---

DISSENTING OPINION BY VAN DER VOORT, J.:

Appellant, accused of violating his parole, was brought before Judge GRIFO upon his order for a hearing on September 19, 1973, at which time he was represented by counsel. Before any testimony was taken, the judge in-

---

clear and convincing evidence that the person is severely mentally disabled or dangerously disabled and in need of treatment. The court shall order that such person be taken to an appropriate treatment program in an approved facility. Appropriate treatment programs shall include programs of outpatient services or partial hospitalization. Inpatient services shall only be deemed appropriate after full consideration has been given to the less restrictive alternatives to inpatient services. Investigation of treatment alternatives shall include consideration of the person's relationship to his community and family, his employment possibilities, all available community resources, and guardianship services."

We have been informed that a successor bill to Senate Bill No. 170 will be introduced by Senator Coppersmith this year.

formed the appellant, among other things, that he had "a report that tells me that it is the medical opinion of Dr. Ovitz that you need institutional care and specifically, 'this patient is dangerous and may need a return to the Allentown State Hospital for supervision and setting of controls' ". Appellant's counsel asked for a continuance "on the grounds that we have had absolutely no advance notice of what this evidence is[1] or what this report is. We need a copy of all the pertinent information. I would also like an opportunity to compare the report of this psychiatrist . . . to the report of the Allentown State Hospital, which evidently, discharged this man as cured last April . . ."

The judge said he had a file and would "make them available to counsel." He further informed counsel as follows: "I will set the matter for additional hearing after you have had an opportunity. You tell me and I will set up another date for a hearing and I am going to direct the Warden at the County Prison to segregate him."[2]

On October 24, 1973, a petition for the examination of appellant by two psychiatrists under Section 408 of the Mental Health and Mental Retardation Act of 1966 was presented to Judge Clinton PALMER who made an order for the examination. The doctors tried to examine appellant on that day (October 24th) but were unsuccessful because the appellant refused to cooperate on the advice of his counsel. The next day (October 25th), which had been set for a hearing on the 408 petition, appellant filed a petition for a habeas corpus and a hearing thereon was held before Judge GRIFO who granted the writ and ordered the appellant discharged from the alleged parole violation. Immediately following the Judge's ruling the attorney for the Commonwealth moved to amend the

---

1. Referring to the evidence of violation of parole.

2. i.e., he would have no cell mate.

petition for a mental examination to one under Section 406 instead of 408 inasmuch as the appellant was no longer incarcerated. The amendment was granted and the court entered into an immediate hearing under Section 406 to determine whether or not there was sufficient evidence to warrant the commitment of appellant to a mental hospital not to exceed ten (10) days for an examination and report to the court on his mental condition. Appellant's counsel objected that she had not been given notice of the hearing under Section 406 although she had notice of a hearing under Section 408.

The hearing pursuant to Section 406(3)(ii) was held. Testimony was heard on behalf of the Commonwealth from a psychiatrist who had examined Appellant on July 9, 1973, and from a probation officer familiar with Appellant's case, both relating that Appellant remained dangerous and in need of care. Testimony was heard on Appellant's behalf from a psychiatrist at Allentown State Hospital, under whose care he had been from January 22 to March 12, 1973, and from a priest who had known him since April of 1973, both relating that the Appellant was no longer dangerous. As a result of this hearing, Appellant was ordered admitted to Muhlenberg Medical Center for examination, for a period not to exceed ten days, pursuant to Section 406(4).

On October 30, 1973, appellant caused to be filed another petition for habeas corpus, arguing that the October 25 hearing had deprived him of his liberty without due process of law, in that he was neither served with nor given proper notice of the 406 petition for civil commitment. He also argued that the "Mental Health and Mental Retardation Act of 1966" is unconstitutional in that it does not warn a patient of his right against self-incrimination when talking with a psychiatrist or physician and does not require the proof-beyond-a-reasonable-doubt-standard for determination of the patient's mental condition being such that he is a danger to himself and others.

On November 5, 1973, a hearing was had on both this habeas corpus petition, as well as a civil court commitment hearing to inquire into the report of the psychiatrist who had examined appellant during his ten-day commitment. Appellant was ordered committed to Allentown State Hospital for a period not to exceed 6 months, and habeas corpus was denied. It is this denial of habeas corpus which is the subject of this appeal.

The appellant complains that in his commitment under Section 406 of the Mental Health Act he was not afforded due process; that the Act is unconstitutional because it does not require

(1) A warning to the patient that he has a right to remain silent and not converse with physicians or psychiatrists which may be self-incriminatory; and

(2) That the patient's danger to himself and others must be proved beyond a reasonable doubt.

In considering proceedings under Section 406 it must be kept in mind that this involves a civil commitment and that the objective of the Act is the protection of the mentally disabled as well of course as the protection of society from irresponsible actions of mentally disabled persons. The due process afforded a person such as the appellant who cannot be examined (in the instant case appellant refused to be examined at a time when there was opportunity to accomplish the examination) consists of a number of steps as follows:

(1) A petition is made by a person who would most likely be a responsible one setting forth his belief of the mental disability and the efforts made to secure an examination of the person involved by a physician;

(2) Upon consideration of the petition the Court, if it is satisfied as to the merits of the petition, issues a warrant to bring the person before the Court,[3] fixes a

---

3. No warrant was issued in the instant case for the reason that the appellant was present in Court at the time set for a hearing. The hearing had already been set because the petition

date for an immediate hearing, makes sure that the person is represented by counsel, (appointing counsel if necessary) and notifying the parties in interest;[4] and

(3) The Court holds a hearing at which hearing the Court determines whether or not there is probable cause either to hold an immediate examination by two physicians or to order the commitment of such person to a hospital or institution where a mental examination can be accomplished. After the mental examination has been accomplished the Court holds a second hearing as a result of which it determines whether or not the person is mentally ill and in need of care and treatment. If the person is adjudged to be mentally ill and in need of care and treatment the Court can then order the person to a facility where such care and treatment can be had. It may permit partial hospitalization or out-patient care.

In this process the person believed to be mentally disabled has representation by counsel at every critical stage of the proceeding. He and his counsel are given an opportunity to present evidence at the preliminary hearing and they have ten days in which to prepare additional evidence to present at the second hearing if they deem it advisable. Furthermore, in the instant case the appellant and his counsel had notice on October 24, 1973, of the presentation of the petition to the Court for a mental examination of the appellant under Section 408 and had a psychiatrist and a priest as witnesses in his behalf.

---

stated it was one under Section 408 of the Mental Health Act because the appellant was incarcerated on a charge of violation of parole. There was no necessity to issue a warrant when the petition was amended to be one under Section 406 of the Act since the appellant was already before the Court with his counsel and his witnesses.

4. In the instant case, the appellant and his counsel had notice in open Court on September 19, 1973, that Dr. Ovitz, a psychiatrist had informed the Court that "This patient is dangerous and may need a return to the Allentown State Hospital for supervision and setting of controls."

The essential ingredients of due process are afforded the person involved in that he is given notice and opportunity to be heard, he is represented by counsel, he has a public hearing based upon testimony taken under oath and an adjudication made by an impartial tribunal: *Commonwealth ex rel. Light v. Maroney,* 413 Pa. 254, 196 A.2d 659 (1964).

The appellant claims that he has a right to remain silent and not converse with the examining physicians because what he might say may be self-incriminating and that he should have *Miranda* warnings of his right to remain silent given to him before the physician asked him any questions.

Proceedings under the Mental Health Act are not criminal investigations. They involve no attempt to charge the person involved with any criminal offense or wrong doing. There is no attempt to convict him nor to punish him. Certainly where the person is mentally disabled he could not understand nor appreciate *Miranda* silence warnings. A very essential ingredient to most psychiatric examinations is conversation with the party being examined. It is unrealistic to attempt to diminish communication between the psychiatrist and the person being examined by warning him to remain silent.

Appellant further claims that his being mentally disabled must be proven beyond a reasonable doubt. Here again, appellant attempts to equate proceedings under the Mental Health Act with criminal trials. Appellant cites the case of *Lessard v. Schmidt,* 349 F. Supp. 1078 (E.D. Wis. 1972), in which the Court does equate civil commitment proceedings for mental disability with trials in criminal cases. Under our Mental Health Act hundreds of people have been committed to mental institutions for care and treatment for mental disability and many have been cured completely. Nearly all have been released after a matter of months of treatment and only hopeless cases have been detained for long periods. Experience

also teaches that the question of mental disability is a highly complicated one, that most examining physicians cannot express their opinion as to mental disability beyond a reasonable doubt but can so express them to be with reasonable medical certainty. We have held that proceedings under the Mental Health Act are not criminal, *Commonwealth v. Anderson,* 221 Pa. Superior Ct. 349, 236 A.2d 555 (1967).

In view of the great number of mentally disabled people who have been helped by proceedings under the Mental Health Act, wherein the standard of proof of the person's mental disability has been by a preponderance of the evidence, I would hold that the standard of proof "beyond a reasonable doubt" does not apply in proceedings under the Act.

I would affirm the Order.

WATKINS, P. J., and PRICE, J., join in this dissenting opinion.